William B. FINAGIN, Gloria L. Finagin, S.G. Leoffler, Jr.,
Grace H. Leoffler, Severine G. Leoffler, III, Dorothy L. Leoffler,
and Red River Aluminum, Inc. *v.*
ARKANSAS DEVELOPMENT FINANCE AUTHORITY

02-1197                                          139 S.W.3d 797

Supreme Court of Arkansas
Opinion delivered December 18, 2003
[Petition for rehearing denied January 29, 2004.]

*Gill, Elrod, Ragon, Owen & Sherman, P.A.*, by: *John P. Gill* and *Richard L. Lawrence*, for appellant.

*David L. Beatty*, for appellee.

RAY THORNTON, Justice. The Arkansas Development Finance Authority [ADFA] was established by Ark. Code Ann. § 15-5-201 *et seq.*, (1987), funded by six million dollars derived from interest on investments, and authorized to issue revenue bonds under the provisions of Amendment 65 to the Constitution for the purpose of developing business and industry in this state. The payment of bonds issued by ADFA was to be made from revenues produced by the business or industry developed by the proceeds of the bonds. Red River Aluminum Co., Inc. [Red River] received $800,000.00 from ADFA in 1987 for start-up at Red River's plant near Stamps. ADFA issued revenue bonds in the amount of $800,000.00 to establish the plant.

The bonds were to be paid from revenues generated by operations of the plant, but were also secured by ADFA's guaranty of the payment of the bonds. ADFA's guaranty was further secured by the personal guaranties of each individual stockholder of Red River. These individual guaranties were not joint and several, but each was for a specific dollar amount calculated to reflect each shareholder's *pro rata* share of the $800,000.00 secured by ADFA's guaranty of the bond issue. William B. Finagin, Gloria Finagin, S.G. Leoffler Jr., Grace H. Leoffler, Severine G. Leoffler III, and Dorothy Leoffler, who with Red River comprised all of the appellants, had executed similar individual guaranty agreements in varying amounts.

In each personal guaranty executed by appellants, it was agreed, among other provisions, that:

> Section 2.1. The guarantor hereby unconditionally guarantees to the Authority [ADFA] for the benefit of the Trustee and the Bondowners ... (a) the full and prompt payment of the principal of ... the bonds ... (b) the full and prompt payment of the interest on the bonds ... and (d) repayment of all sums advanced by the Authority [ADFA] ... within ten (10) days of demand ...[.]

The individual guaranty agreement also contains the following agreement in Section 2.2:

> Section 2.2. The obligations of the guarantor under this agreement shall be absolute and unconditional and shall remain in full force and effect until the entire principal of, and interest on the bonds and expenses and other sums required to be paid by the Company or Guarantor, under the loan agreement, the indenture,

this agreement or any other security documents, shall have been paid or provided for, irrespective of the validity, regularity, or enforceability of the bonds ...[.]

The agreement further provides:

Section 4.2. The obligations of the guarantor hereunder shall arise absolutely and unconditionally when any of the bonds shall have been issued, sold, and delivered by the Authority [ADFA].

A number of other original shareholders, primarily from south Arkansas, executed similar personal guaranties commensurate with their *pro rata* shares of stock ownership, but these individuals had either sold their stock to the appellants, or had the stock redeemed by the corporation during 1988 and 1989. Contemporaneously with the sale or redemption of their stock ownership, these individuals were released from their individual personal guaranties. At the time these releases were given, Mr. Finagin, S. G. Leoffler Jr. and Severine Leoffler III were stockholders and members of Red River's board of directors.

On July 15, 1990, appellants sold their stock in Red River for the amount of their original investment. They were not released from their personal guaranties of the ADFA Guaranty. In July of 1994, Red River mortgaged its plant to the Arkansas Industrial Development Corporation [AIDC], now known as the Arkansas Department of Economic Development, and the AIDC took a security-interest in land, buildings and equipment. ADFA, through Simmons First National Bank, subordinated its lien in equipment purchased through the AIDC loan proceeds.

In 1995, Red River defaulted on the ADFA loan, and ADFA commenced making periodic payments under its guaranty agreement. On March 1, 1998, ADFA retired all outstanding bonds pursuant to its guaranty agreement and in October of 1998 made demand upon each individual appellant for payments of a portion of the sum each appellant had personally guaranteed as a requirement for ADFA's guaranty of the $800,000.00 bond issue.

Appellants, upon receiving notice and demand for payment on October 19, 1998, did not promptly make payments pursuant to their individual guaranties to ADFA, and ADFA filed suit to enforce their personal guaranties in July of 1999. Following a bench trial, the trial court entered its judgment for ADFA and

from this judgment appellants bring this appeal. For the reasons we now set forth, we affirm the decision of the trial court.

█ Appellants are appealing from a bench trial. In bench trials, the standard of review is not whether there is any substantial evidence to support the finding of the court, but whether the judge's findings were clearly erroneous or clearly against the preponderance of the evidence. *Reding v. Wagner*, 350 Ark. 322, 86 S.W.3d 386 (2002). Guided by our standard of review, we will consider each point argued by appellants in the order presented in their brief.

### I. The trial court erred in holding the personal guaranty contracts were valid and enforceable.

#### A. ADFA has no authority to execute personal guaranties.

In their first point on appeal, appellants argue that the legislature did not grant ADFA authority to execute personal guaranties. A review of the "Arkansas Development Finance Authority Bond Guaranty Act" [the Act] is necessary before addressing appellants' contention. The Act was passed by the legislature in 1985. The rationale for the Act was articulated in Ark. Code Ann. § 15-5-402 (Repl. 2000), which provides in part:

(a) The General Assembly finds:

(1) That there exists severe economic instability in traditional national and international markets for goods and services produced by the citizens of the State of Arkansas. This instability has caused serious economic distress among the citizens of our state and is manifest in the increasing number of business failures and bankruptcies, both personal and corporate, and the extraordinarily high levels of unemployment in agricultural business and industrial enterprises

\* \* \*

(b) For these reasons, the General Assembly finds that there exists in the state an immediate and urgent need to provide the means and methods for providing financing and enhancing and supporting the credit of such financing to:

(1) Restore and revitalize existing agricultural business and industrial enterprises for the purpose of retaining existing employment within the state;

(2) Promote and develop the expansion of existing and the establishment of new agricultural business and industrial enterprises for the purpose of further alleviating unemployment within the state and for providing additional employment;

(3) Promote and target resources of the state to further the development of export trade of Arkansas products for the purpose of the economic development of the state and for providing additional employment therefrom;

\* \* \*

(c) It is declared to be the public policy and responsibility of this state to promote the health, welfare, safety, morals, and economic security of its inhabitants through the retention of existing employment and alleviation of unemployment in all phases of agricultural business and industrial enterprises.

\* \* \*

(d) The General Assembly finds that the public policies and responsibilities of the state as set forth in this section cannot be fully attained without the use of public financing and that such public financing can best be provided by the creation of a means of enhancing and supporting the credit of such public financing by establishing a bond guaranty procedure to be administered by the Arkansas Development Finance Authority.

*Id.*

Pursuant to the Act, ADFA was chosen to administer a bond guaranty procedure. The Act outlined when bonds may be guaranteed and described certain provisions to be included in the guaranty agreement. *See* Ark. Code Ann. § 15-5-405 and 412 (Repl. 2000). Additionally, the Act granted ADFA broad authority to perform its duties. Specifically, Ark. Code Ann. § 15-5-413 (Repl. 2000), in relevant part states:

(a) The Arkansas Development Finance Authority is authorized and directed to conduct such investigation as it may determine

necessary for the promulgation of regulations to govern the operation of the guaranty program authorized by this subchapter, which regulations shall include the restriction and conditions imposed by this subchapter, including particularly those set forth in §§ 15-5-405 and 15-5-412, and which may include such other and additional provisions, restrictions, and conditions as the authority, after the investigation referred to above, shall determine to be proper to achieve the most effective utilization of the guaranty program authorized by this subchapter, including, without limitation, a detailing of the remedies that must be exhausted by the bondholders or a trustee acting in their behalf prior to calling upon the authority to perform under its guaranty agreement and the subrogation or other rights of the authority with reference to the project and its operation in the event the authority makes payment pursuant to the applicable guaranty agreement.

*(b) In this regard, the authority is expressly authorized to take such action and enter into such agreements and otherwise take such action as may be necessary to exercise the authority conferred by this subchapter or to evidence the exercise thereof.*

Id. (emphasis added).

Informed by the relevant statutory provisions, we turn to appellants' challenge to ADFA's authority. On this issue, the trial court found:

The Leoffler defendants argued that ADFA did not have the capacity to contract nor require personal guaranties. There is clearly no prohibition of such in the Act. Although personal guaranties are not specifically authorized under the Act, A.C.A. 15-5-413 gives ADFA the authority to promulgate regulations to govern the operation of its bond guaranty program and make reasonable lending requirements, including that of personal guaranties.

The trial court's findings are not clearly erroneous. As it correctly noted, Ark. Code Ann. 15-5-413(b) expressly grants ADFA unrestricted authority to "take such action and enter into such agreements and otherwise take such action as may be necessary to exercise the authority conferred by this subchapter or to evidence the exercise thereof." *Id.* We conclude that it is clear through the use of such language that the legislature did not limit the authority of ADFA to take what actions it deemed fit and

proper to fulfill the statutory mandate to assist the development of Arkansas business and industry through bonds and loans. Accordingly, the trial court did not err in finding that ADFA had authority to require individual guaranties.

### B. ADFA negligently misrepresented that it had complied with the law.

Next, appellants argue that "even if ADFA had authority to require personal guaranties, it failed to comply with the statutory authority it was clearly given, namely, evaluating financial responsibility of the borrower prior to making a loan. That failure was a negligent misrepresentation to appellants justifying release of their personal guaranties." This issue is not properly before this court because appellants failed to obtain a final ruling on this matter. We have repeatedly held that a party's failure to obtain a ruling is a procedural bar to our consideration of an issue on appeal. *Dovers v. Stephenson Oil Co, Inc.*, 354 Ark. 695, 128 S.W.3d 805 (2003). Appellants briefly mentioned the idea of negligent misrepresentation during closing argument, but never sought or received a ruling from the trial court. Accordingly, we do not consider this issue.

### II. The trial court erred in not releasing appellants from their personal guaranties when other obligors had been released.

Appellants also contend that the trial court erred in not releasing them from their personal guaranties when other obligors had been released. Specifically, citing *Vandever v. Clark*, 16 Ark. 331 (1855) and *Pettigrew Machine Co. v. Harmon*, 45 Ark. 290 (1885), appellants argue that a release to one of several obligors is a release as to all obligors. Appellants' application of this legal principle to the case *sub judice* is misplaced.

*Vandever, supra* involved primary obligations on a note between co-makers. The respondents in *Vandever* all signed the primary written expression of indebtedness. The five respondents had pledged that "we, or either of us, promise to pay" to appellant. *Id.* Vandever, having accepted payment for the full amount of the note from two of the respondents, was unable to collect from the other three because acceptance of payment from a co-maker acted as a release to all others liable on the note. *Id.*

██ Similarly, *Pettigrew, supra* is another action on a note against the makers and their assignee. We reiterated that a release as to one person of a group liable as joint or joint-and-several debtors acts as a release to all. *Id.* In the case of parties jointly-and-severally liable, we noted that there is only a single debt and payment or release of some part of that debt acts as a release throughout. *Id.* It was further stated that this effect would only occur if the creditor expressly stated he was releasing the claim as to all debtors. *Id.*

██ The facts in *Vandever* and *Pettigrew* are clearly distinguishable from the facts in the case now on review. Specifically, the case now before us does not involve a single debt or obligation incurred by a group nor does it involve an issue of joint and several liability. According to Gene Eagle, an employee of the Arkansas Development Finance Authority, ADFA required each shareholder in Red River to sign guaranty agreements. The guaranty agreements were individual *pro rata* guaranties rather than joint and several. Mr. Allen explained that "a *pro rata* guaranty is based upon the percentage of ownership at the time the loan is made. Joint and several means that every stockholder guarantees the full amount." Because each of the appellants individually signed a guaranty for a stated amount, and because each appellant was individually liable based on the separate guaranties, we hold that a release of one guarantor does not release all guarantors. Accordingly, the trial court's finding was not clearly erroneous.

*III. The trial court erred in not releasing appellants from their liability under the personal guaranties when ADFA impaired the collateral.*

*A. The risk of each personal guaranty was increased without consent.*

In their next point on appeal, appellants contend that the trial court erred in not releasing appellants from their liability under the personal guaranties when ADFA impaired the collateral. Specifically, appellant claim: (1) that ADFA unlawfully increased the risk of each personal guaranty; (2) that this increased risk constituted a material change to the guaranty agreement; and (3) that this material change should have released them from their guaranty agreements.

■ A material alteration in an obligation, made without the assent of the guarantor, may discharge the guarantor. *Smith v. Elder,* 312 Ark. 384, 849 S.W.2d 513 (1993). An alteration is not material unless the guarantor is placed in the position of being required to do more than his original undertaking. *Id.* In determining whether an alteration is material the courts look to see whether the surety has been placed in a position different from that which it promised to guarantee. *Carroll Boone Water Dist. v. M. & P. Equip. Co.,* 280 Ark. 560, 661 S.W.2d 345 (1983). ·

Appellants argue that ADFA materially altered the guaranty agreement by not preventing the Arkansas Industrial Development Commission from making a loan to Red River Aluminum thereby obtaining a security interest associated with that loan. Additionally, appellants argue that the AIDC loan violated Section 409 of the Trust Indenture. Section 409 of the Trust Indenture provides:

> [ADFA] covenants that so long as any bonds authorized by and issued under the Indenture are outstanding, [ADFA] will not convey or otherwise dispose of its interest in the mortgaged property, and that [ADFA] will not encumber the same, or any part thereof, or its interest therein, or create or permit to be created any charge or lien on the revenues derived therefrom, except as provided in this Indenture ... it being the purpose of this covenant to limit only a subsequent pledge of the mortgaged property and revenues as defined in this Indenture. '

Section 101 of the Trust Indenture defines "revenues" as:

> The income, including penalties and interest, derived by [ADFA] under the Loan Agreement and from [Red River Aluminum], and also amounts payable under the ADFA Guaranty.

■ Mindful of the foregoing language, we turn to the facts surrounding the AIDC loan. Red River Aluminum, the City of Stamps, and AIDC entered into a development–loan agreement on April 14, 1994. ADFA did not sign this development–loan agreement and there is no evidence that ADFA was a party to the loan. AIDC took a security interest as collateral for the loan separate from the security interest ADFA possessed. There is disputed evidence as to the priority of the AIDC interest and the extent of the collateral securing the AIDC loan. There was documentary evidence that AIDC took a second-priority interest. This question

was not resolved in this proceeding. Appellants claim that regardless of the priority, this security interest materially altered the guaranty agreements because there will still remain a lien on the property of Red River Aluminum after the appellants have paid ADFA on the individual guaranties. Appellants promised to pay ADFA if ADFA had to step into the shoes of Red River Aluminum in making payments on the bonds. The individual guaranties provided that ADFA could recover payment from appellants pursuant to the specified dollar amount of each guaranty. The AIDC loan and security interest does not alter the nature of appellants' obligations to ADFA. Appellants remain in the position of guaranteeing ADFA the same dollar amount specified in the guaranties regardless of the AIDC loan. We conclude the AIDC loan did not materially alter the appellants' guaranties, and that appellants' contention is misplaced.

Appellants also argue that ADFA violated the Trust Indenture by not objecting to or otherwise preventing the AIDC loan. The Trust Indenture forbids ADFA from allowing a lien or charge to be created on the revenues derived from the mortgaged property. In section 101 of the Trust Indenture, the definition of "revenues" is limited to the moneys receivable by ADFA under the loan agreement. The Indenture prevents ADFA from pledging such receivables pledged to the payment of the bonds and guaranties as collateral for some other transaction. The Trust Indenture is silent as to whether Red River Aluminum could pledge the mortgage property as security for a subsequent loan for other business purposes. The AIDC loan does not impede or otherwise impair the penalties, interest, or payments to be made to ADFA so as to create a violation of the Trust Indenture. We conclude that ADFA did not materially alter the personal guaranties. Accordingly, the trial court was not clearly erroneous in declining to release appellants from their personal guaranties.

*B. The collateral was lost through ADFA's negligence.*

Appellants next contend that ADFA negligently lost or failed to protect the Red River collateral before going to the individual guarantors for satisfaction of their personal guaranties and that based on this negligence the appellants should be released from their liability under the personal guaranties. Specifically, appellants assert that ADFA should have taken actions such as repossessing or

selling land or equipment owned by Red River in an attempt to satisfy Red River's outstanding debt before attempting to enforce appellants' personal guaranties.

ADFA responds to this assertion by contending that the provisions of the guaranty agreements did not require such actions. Specifically, ADFA cites Section 2.4 of the guaranty agreement which provides:

> In the event of a failure by the company [Red River] to repay authority [ADFA] in full within the time called in section 2.1 hereof, authority without further notice or demand and in its sole discretion, shall have the right to proceed first and directly against the guarantor under this agreement *without proceeding against or exhausting any other remedies which it may have and without resorting to any other security held by the authority or the trustee.*

The foregoing language, which was approved by appellants, expressly authorizes the actions taken by ADFA. Specifically, the language from the guaranty agreement does not require ADFA to repossess, secure, or sell property or equipment owned by Red River to satisfy Red River's debt. Accordingly, ADFA properly proceeded against the guarantors.

ADFA also makes the argument that because it was a creditor not in possession of the collateral it had no duty to protect the collateral for the benefit of the appellants. ADFA's contention is well taken. We have explained that a creditor in possession of collateral is held to a high standard of care. *See First National Bank v. Waddell*, 74 Ark. 248, 85 S.W. 417 (1905). However, we have also explained that a creditor is not obligated to preserve the right of recourse in collateral of a surety. *Id.* Finally, we have stated that a creditor has *no* duty to repossess collateral to protect or for the benefit of a guarantor. *Moore v. Luxor*, 294 Ark. 326, 742 S.W.2d 916 (1988). In light of applicable principles of law, we conclude that ADFA, as a creditor not in possession of the collateral, was not required to protect the collateral for the benefit of the guarantors.

*IV. The trial court erred in upholding the waiver of all defenses provisions in the personal guaranties.*

In their next point on appeal, appellants argue that the trial court erred by granting ADFA's motion to strike all

defenses pleaded by appellants based on the waiver of defenses provision, Section 2.3 of the personal guaranties. Specifically, appellants argue that this provision of the guaranty agreement was too broad and against public policy. Section 2.3 of the guaranty agreement provides:

> No setoff, counterclaim, reduction, diminution of an obligation, or any defense of any kind or nature which the guarantor [appellants] has or may have against the authority [ADFA] or the trustee shall be available hereunder to the guarantor against the authority.

Section 2.3 is an exculpatory contract. An exculpatory contract is one in which a party seeks to absolve himself in advance for the consequences of his own negligence. *National Union Fire Ins. Co. v. Guardtronic, Inc.*, 76 Ark. App. 313, 64 S.W.3d 779 (2002). Such contracts are not invalid *per se* and have been upheld in several cases. *See Plant v. Wilbur*, 345 Ark. 487, 47 S.W.3d 889 (2001); *Edgin v. Entergy Operations, Inc.*, 331 Ark. 162, 961 S.W.2d 724 (1998). When reviewing exculpatory contracts we apply two rules of construction. *National Union, supra.* First, they are to be strictly construed against the party relying on them. *Farmers Bank v. Perry*, 301 Ark. 547, 787 S.W.2d 645 (1990). Second, to be enforceable, the contract must clearly set out what negligent liability is to be avoided. *Plant, supra.* Additionally, we have held that when we are reviewing such a contract we are not restricted to the literal language of the contract, and will also consider the facts and circumstances surrounding the execution of the release in order to determine the intent of the parties. *Miller v. Pro-Transportation*, 78 Ark. App. 52, 77 S.W.3d 551 (2002) (citing *Plant, supra*).

In our review of the facts surrounding the execution of the contract for the purpose of determining whether the waiver provision is enforceable we are guided by similar cases. In *Plant, supra*, we were asked to determine whether an agreement, releasing an owner of a racetrack from any liability from injuries sustained at the track, was valid. After reviewing the release, we considered the facts surrounding the execution of the release and affirmed the trial court's finding that the release was valid. We wrote:

Plant was a regular participant in auto races and admitted to having frequented the Speedway. He also stated that he had signed the exact same release form on at least twelve prior occasions. Plant has made no allegations that he was forced to sign the release, and he admitted that he never asked any questions regarding the contents of the document he was signing. Moreover, Plant was familiar with the pit area and its proximity to the racetrack. He stated that he was only in the pit area when his team's car was racing, and that when he was there as a mere spectator, he stayed in the grandstand area. More importantly, as a participant, Plant was certainly familiar with the dangers inherent in the sport of auto racing. In fact, he admitted to having witnessed numerous wrecks that occurred during racing events. With this knowledge, Plant continued to voluntarily participate in this activity.

* * *

Considering the facts and circumstances surrounding the execution of the release by Plant, we agree with the trial court that this release was valid, and therefore, summary judgment was appropriate.

*Plant, supra.*

Our court of appeals has also reviewed cases which are useful to our consideration of the validity of Section 2.3 of the guaranty agreements. In *National Union, supra*, the court of appeals was asked to review exculpatory clauses contained in various contracts. After concluding that the contract clauses were valid and enforceable, the court of appeals held:

> there is nothing in the circumstances surrounding the execution of the contracts that would merit invalidating the exculpatory clauses. The parties herein were businesses dealing at arms' length. The clauses were not hidden from Crain, nor was Crain misled or prevented from reading the clauses. Further, Crain paid a relatively meager amount for appellees' services, and appellees sought accordingly to either absolve themselves from liability for their own negligence or limit their liability to a small dollar amount.

*Id.*

In *Miller, supra.*, the court of appeals was again asked to review a contractual release of liability. The facts from the case are as follows:

Carl Miller was employed by Pro-Transportation as a truck driver. Appellant is Mr. Miller's wife. Appellant wanted to ride as a passenger with her husband as he drove for Pro-Transportation. To obtain Pro-Transportation's permission to do so, appellant executed a passenger authorization application on May 23, 1998. In it appellant agreed that, in consideration for her being permitted to ride as a passenger, she would hold Pro-Transportation harmless from any liability for any damage or injury she might receive while riding in Pro-Transportation's truck. The passenger authorization application also required appellant's husband to authorize a payroll deduction of $24.00 per month to cover the cost of accident insurance for appellant. Appellant accompanied her husband and was injured in a single-vehicle traffic accident. Her medical expenses were covered by the insurance procured pursuant to the passenger authorization request. She filed suit against Pro-Transportation, alleging that it was responsible for the negligence of its employee (her husband), that the accident was caused by her husband's negligent operation of the truck, and that she was entitled to compensatory and punitive damages. Pro-Transportation moved for summary judgment on the basis of the exculpatory provision of the passenger authorization application. The trial court granted the motion and entered an order granting summary judgment to Pro-Transportation.

*Id*. On appeal, Mrs. Miller argued that the release should not be enforced because it did not clearly describe the negligent liability to be avoided. *Id*. The court rejected this argument and held:

In the present case, we think it significant that appellant had accompanied her husband as a passenger in trucks owned by three different trucking companies, and was consequently aware of the nature of trucking operations and the dangers inherent in them. That the parties realized that personal injury could result from these dangers is shown by the provision for medical insurance to cover appellant in the event of an accident. Finally, we think that the public policy of encouraging careful behavior that underlies the disfavor for such exculpatory clauses has little application in the present case, where the allegedly negligent party, appellant's husband, was the driver of the vehicle and, therefore had far more compelling reasons to drive carefully than the avoidance of possible tort liability.

*Id*.

We endorse the reasoning of the court of appeals in deciding these cases, and we note that those cases establish the principle that an exculpatory clause may be enforced: (1) when the party is knowledgeable of the potential liability that is released; (2) when the party is benefitting from the activity which may lead to the potential liability that is released; and (3) when the contract that contains the clause was fairly entered into.

In the case now before us, we conclude that enforcement of Section 2.3 of the guaranty agreement, and thereby the striking of appellants' defenses was not clearly erroneous. Appellants, who were shareholders in Red River, entered into the guaranty agreements with ADFA in exchange for funding for Red River. Appellants each signed discrete, personal agreements. We must assume that each appellant read and approved the terms articulated in the relevant guaranty agreement. *See Carmichael v. Nationwide Life Ins. Co.*, 305 Ark. 549, 810 S.W.2d 39 (1991) (holding that a party is bound under the law to know the contents of the documents that he signs, and that he cannot excuse himself from its contents by alleging that he did not know its contents). There is no evidence in the record to suggest that appellants are unsophisticated businesspeople or that the agreements were entered into unfairly. Moreover, the agreements were entered into in the course of businesses dealing at arms' length. Based on these facts, we conclude that appellants knew that they were waiving potential defenses when they signed the guaranty agreements but chose to agree to the terms of the contract, thereby benefitting by securing financing for Red River. Accordingly, we cannot say that the trial court's actions in enforcing the waiver of defenses provision of the guaranty agreements were clearly erroneous.

*V. The Bond Guaranty Act is unconstitutional.*

In a final point on appeal, appellants contend that the Bond Guaranty Act, codified at Ark. Code Ann. § 15-5-401 *et seq.* (Repl. 2000), is unconstitutional. This allegation was raised in appellants' amended answer. Appellants argued that the Act is unconstitutional because it violates the prohibition against the State lending its credit. Appellee responded to the challenge by filing a motion to strike in which it argued that appellants' amended answer should be struck because: (1) the appellants lacked standing to challenge the Act; (2) the constitutional chal-

lenge was not relevant or material to the issues before the court; and (3) appellee would be prejudiced by the late filing of the amended answer. A hearing was held on appellee's motion to strike. Following this hearing, an order was entered in which the trial court granted appellee's motion to strike appellants' amended answer. The trial court's order also noted that "the issue of constitutionality of the Arkansas Development Finance Authority Bond Guaranty Act of 1985 is not relevant or material to the determination of the issues herein." However, after striking appellants' amended answer, which sought to raise the issue of the constitutionality of the statute, and after concluding that the determination of the constitutional claim was irrelevant and immaterial, the trial court made the statement that "the Arkansas Development Finance Authority Bond Guaranty Act of 1985 is constitutional."

█ █ Upon our review of the facts surrounding the trial court's statement that the Act was constitutional, we conclude that it was a superfluous observation of the kind referred to as *obiter dicta*. Specifically, the relief sought by appellee was to strike the pleading in which the constitutional challenge had been raised. The trial court granted this relief, thereby eliminating the constitutional challenge from consideration in this suit. Even if the trial court's statement was not *dicta*, we note that the issue of the Act's constitutionality was not properly developed for consideration by the trial court during the proceedings. We do not address issues that have not been fully developed below. *See AT & T Communications of the Southwest, Inc. v. Arkansas Public Service Comm.*, 344 Ark. 188, 40 S.W.3d 273 (2001) (holding that an appellant must fully develop an issue at the lower court level in order to preserve it for appellate review). Accordingly, the constitutionality of the Act is not before us for review.

Affirmed.