Michael L. JORDAN and Rachel Jordan  *v.*
DIAMOND EQUIPMENT & SUPPLY CO.

04-1113                                                     207 S.W.3d 525

Supreme Court of Arkansas
Opinion delivered April 28, 2005

[Rehearing denied June 2, 2005.*]

---

* HANNAH, C.J., and GLAZE and IMBER, JJ., would grant rehearing.

*Blair & Stroud*, by: *H. David Blair* and *The Nixon Law Firm*, by: *David G. Nixon*, for appellants.

*Bassett Law Firm*, by: *Curtis L. Nebben*, for appellee.

JIM GUNTER, Justice. This case arises from an order from the Benton County Circuit Court granting a motion for summary judgment filed by appellees, Diamond Equipment & Supply Co. ("Diamond") in a personal-injury action brought by appellants, Michael R. Jordan and Rachel Jordan. We affirm the trial court's ruling.

On October 31, 2001, appellant Michael L. Jordan, who is engaged in the business of light construction and landscaping, was involved in a landscaping project on the premises of a customer. The project required that appellant transport loose materials to the top of a slope, so he went to Diamond to rent a Bobcat Model 763 skid-steer loader ("Bobcat loader") for this purpose. Diamond is engaged in the business of renting and leasing various items of equipment and tools to the public. While at Diamond, Jordan sought the advice from Diamond personnel as to the appropriate machine for the task, and based on that information, Jordan elected to rent the Bobcat loader and a trailer for one day. Jordan entered into a contract with Diamond for the leasing of the Bobcat loader and the trailer and signed a rental agreement, which contained an exculpatory clause. Jordan signed the invoice and paid a fee totaling $185.87 for the lease of the equipment for the one-day period.

That same day, after obtaining the Bobcat loader, Jordan returned to his landscaping project. During the course of his job, the Bobcat loader became top-heavy and overturned backward and flipped several times down the sloped terrain. As a result, Jordan suffered a severe impact to his spine, which caused permanent spinal-cord injuries.

On May 12, 2003, Jordan and his wife, Rachel, brought a negligence action against Diamond. On June 26, 2003, Diamond answered, and on April 23, 2004, Diamond filed a motion for summary judgment, arguing that under Ark. R. Civ. P. 56, the trial court should rule as a matter of law in favor of Diamond.

On May 4, 2004, the Jordans responded to Diamond's motion for summary judgment, arguing that the language in the clause "does not exculpate Diamond from the consequences of its own negligence in connection with its acts and omissions in connection with the rental of the Bobcat loader . . . [.]" The Jordans contended that the language in the provision does not exculpate Diamond from the failure to provide adequate instructions and warnings, and that the agreement is void for lack of mutuality of obligation. They further alleged that the provision is void for lack of consideration, and that the boilerplate language in the agreement violates public policy.

On May 11, 2004, Jordan filed a first amended and substituted complaint upon a theory of negligence for (1) failure to take into account in advising Jordan of the appropriate machine for the

conditions and circumstances under which he intended to use it; (2) failure to adequately instruct Jordan as to the safe operating procedures and conditions upon which the machine could be safely operated; (3) failure to advise Jordan of the stability characteristics of the machine and of the difference in distribution of weight bias in loaded versus unloaded conditions; (4) failure to warn Jordan that the Bobcat loader was unsuited for use of loading or unloading materials upon an inclined surface, which could have been reasonably anticipated by Diamond; (5) failure to warn Jordan that the Bobcat loader was suitable for use, including loading and unloading, only on relatively flat surfaces; and (6) failure to instruct and educate its personnel as to the proper operating procedures of skid-steer loaders and of the stability characteristics of these machines. Jordan sought damages for past and future pain, mental anguish, past and future medical expenses, past loss of earning and working time, past and future impairment of earning capacity, and permanent physical impairment and disability. His wife, Rachel Jordan, sought damages for loss of consortium.

An order was filed on May 14, 2004, dismissing with prejudice separate defendant Clark Equipment, the manufacturer of the Bobcat, including its unincorporated business unit, Bobcat Company.

On June 28, 2004, the trial court entered an order granting Diamond's motion for summary judgment. The Jordans filed a motion to amend the order granting summary judgment on July 6, 2004, and the trial court denied that motion. From the order granting summary judgment, the Jordans bring this appeal.

We articulated the standard of review for summary-judgment cases in *O'Marra v. Mackool*, 361 Ark. 32, 204 S.W.3d 49 (2005), where we stated:

> Summary judgment should be granted only when it is clear that there are no genuine issues of material fact to be litigated, and the party is entitled to judgment as a matter of law. *Riverdale Development Co. v. Ruffin Building Systems Inc.*, 356 Ark. 90, 146 S.W.3d 852 (2004); *Craighead Elec. Coop. Corp. v. Craighead County*, 352 Ark. 76, 98 S.W.3d 414 (2003); *Cole v. Laws*, 349 Ark. 177, 76 S.W.3d 878 (2002). The burden of sustaining a motion for summary judgment is the responsibility of the moving party. *Pugh v. Griggs*, 327 Ark. 577, 940 S.W.2d 445 (1997).

Once the moving party has established a *prima facie* entitlement to summary judgment, the non-moving party must meet proof with proof and demonstrate the existence of a material issue of fact. *Id.* On appellate review, we determine if summary judgment was appropriate based on whether the evidence presented by the moving party in support of its motion leaves a material fact unanswered. *George v. Jefferson Hosp. Ass'n Inc.,* 337 Ark. 206, 987 S.W.2d 710 (1999). We view the evidence in the light most favorable to the non-moving party, resolving all doubts and inferences against the moving party. *Adams v. Arthur,* 333 Ark. 53, 969 S.W.2d 598 (1998).

*O'Marra, supra.*

For their first point on appeal, the Jordans argue that the trial court should have denied the enforcement of the exculpatory clause in Diamond's agreement upon the grounds of public policy. In response, Diamond contends that the exculpatory clause is enforceable, conforms to Arkansas public policy, and the trial court properly upheld the exculpatory clause.

The trial court ruled in its June 28, 2004, order:

The warranties and liability paragraph on the back side of the one page document is an exculpatory clause which requires strict scrutiny by this court. In performing that scrutiny, the court has looked at the location of the paragraph; the fact that the paragraph is set apart and is conspicuous; the language used in the paragraph is clear and unambiguous; the language in the exculpatory clause sets out what negligent liability is to be avoided in very clear language; the circumstances surrounding the execution of this contract which involved the plaintiff approaching the defendant, Diamond Equipment and Supply Company, and soliciting the use of this equipment, and paying a fairly meager sum for the rental of the equipment.

In applying the factors set forth in *Finagin v. Arkansas Development Finance Authority,* ... the court finds that Mr. Jordan knew the potential liability that was released, he benefitted from the activity causing the liability (he was being paid for this landscaping job); and the contract was fairly entered into.

An exculpatory contract is one where a party seeks to absolve himself in advance of the consequences of his own negligence. *Finagin v. Arkansas Development Finance Authority,* 355 Ark. 440, 139 S.W.3d 797 (2003). Contracts that exempt a party from

liability for negligence are not favored by the law. *Plant v. Wilbur*, 345 Ark. 487, 47 S.W.3d 889 (2001); *Farmers Bank v. Perry*, 301 Ark. 547, 787 S.W.2d 645 (1990); *Middleton & Sons v. Frozen Food Lockers*, 251 Ark. 745, 474 S.W.2d 895 (1972); *Arkansas Power & Light Co. v. Kerr*, 204 Ark. 238, 161 S.W.2d 403 (1942); *Gulf Compress Co. v. Harrington*, 90 Ark. 256, 119 S.W. 249 (1909). This disfavor is based upon the strong public policy of encouraging the exercise of care. *Plant, supra.*

However, such exculpatory contracts are not invalid *per se. Plant, supra.* Because of the disfavor with which exculpatory contracts are viewed, two rules of construction apply to them. First, they are to be strictly construed against the party relying on them. *Plant, supra.* Second, we have said that it is not impossible to avoid liability for negligence through contract, but that, to avoid such liability, the contract must at least clearly set out what negligent liability is to be avoided. *Plant, supra.* Further, we have held that when we are reviewing such a contract, we are not restricted to the literal language of the contract, and we will also consider the facts and circumstances surrounding the execution of the release in order to determine the intent of the parties. *Finagin, supra.*

We upheld exculpatory clauses in *Edgin v. Entergy Operations, Inc.*, 331 Ark. 162, 961 S.W.2d 724 (1998), and *Plant, supra.* In *Edgin*, a security guard was employed by Wackenhut Corporation to work at Entergy's nuclear plant in London. While on the job, the security guard sustained injuries, and she filed suit in tort against Entergy. Her employment agreement with Wackenhut contained an exculpatory clause, which read in pertinent part, "I hereby waive and forever release any rights I might have to make claims or bring suit against any client or customer of Wackenhut for damages based upon injuries which are covered under . . . Workers' Compensation statutes." We held:

> Appellants argue that the agreement in this case does not specifically set out what negligent liability is to be avoided. We disagree. We are persuaded by Appellee's argument that the agreement is clear and unambiguous and only releases the clients of Wackenhut from liability for work-related injuries sustained by a Wackenhut employee that are covered by the workers' compensation statutes. By signing the employment application, an employee is not forfeiting his or her right to receive *any* compensation for work-related injuries; rather, the employee is merely agreeing to waive an *additional* remedy against a client of Wackenhut in ex-

change for employment with Wackenhut. In this respect, we cannot say that the agreement violates public policy by discouraging the employer or its clients from exercising reasonable care. Nor can we say that the language of the agreement did not clearly identify what the employee was giving up in exchange for employment. The employer is not attempting to escape liability entirely, but is, instead, attempting to shield its clients from separate tort liability for those injuries that are covered by workers' compensation, unlike the agreements at issue in *Farmers Bank* and *Firstbank*.

Furthermore, our interpretation of this agreement is not inconsistent with the sound public policy considerations that form the basis of our workers' compensation laws.

*Edgin, supra.* Thus, we held that the exculpatory clause at issue specifically set out what negligent liability was to be avoided and that the language of the exculpatory clause was clear and unambiguous. *Id.*

In *Plant, supra*, appellant Plant signed an agreement before entering a pit area of a racetrack operated by appellee Wilbur. The document, which was a form used by racetracks across the country, was titled, "Release and Waiver of Liability and Indemnity Agreement." We held that the clause was enforceable, noting that it contained certain key phrases such as "releases," "discharges," "covenants not to sue," and mentioned claims for negligence in three different places. In taking the "total transaction" approach, we affirmed the trial court's consideration of the circumstances surrounding the execution of the document, such as the fact that Plant had signed the document on other occasions, was not forced to sign the document, and had equal bargaining power. We also considered the fact that the activity involved was recreational in nature. *Id.*

Further, in our review of exculpatory clauses, we outlined three factors in *Finagin, supra*, where we said:

[W]e note that an exculpatory clause may be enforced: (1) when the party is knowledgeable of the potential liability that is released; (2) when the party is benefitting from the activity which may lead to the potential liability that is released; and (3) when the contract that contains the clause was fairly entered into.

*Id.*

Under the foregoing authority, we must strictly construe the exculpatory contract against Diamond, and we must ask whether Diamond clearly sets out what negligent liability is to be avoided.

We must also apply the *Finagin* factors to the exculpatory clause in Diamond's agreement in order to determine if it is enforceable.

We now turn to the agreement between Jordan and Diamond. It contains the following exculpatory clause entitled, "Warranties and Liability," and provides:

> Diamond Equipment Rental and Supply, Inc. is not responsible for injuries or damages sustained in the use of these items whether the damages are due to neglect, mechanical failure, or any other cause whatsoever, regardless of who happens to be operating the equipment. The lessee assumes full liability from the time the equipment is rented until it is returned. The lessee accepts the items in the "as is" condition and does hereby absolve and relieve lessors from any liability by reason of or resulting from the condition of the rented items. Lessee binds and obligates himself to hold lessors free and harmless from any and all liability from any claims of third persons in connection with or arising out of the condition or use of the rented items. Any repairs made to items listed in this contract by anyone other than a lessor or its employee shall be the sole responsibility of the lessee, unless written authority for said repairs is granted by Diamond Equipment Rental and Supply, Inc.

■ Here, the clear, unambiguous language of the exculpatory clause states that Diamond "is not responsible for injuries or damages sustained in the use of these items whether the damages are due to neglect, mechanical failure, or any other cause whatsoever, regardless of who happens to be operating the equipment." Diamond specifically states that it is not liable for damages sustained during the use of its equipment by the lessee due to "neglect, mechanical failure, or any cause whatsoever."

■ Under a "total transaction" approach, as articulated in *Plant, supra*, we note that Jordan solicited Diamond's business by inquiring about the appropriate equipment for his landscaping project, getting instruction from Diamond personnel on how to operate the Bobcat loader, signing the agreement, and paying $185.87 in exchange for renting the Bobcat loader and a trailer for one day.

■ Moreover, all three *Finagin* factors are satisfied in the present case. First, it appears that Jordan was knowledgeable of the potential liability that is released when he signed the contract with Diamond. The front of the invoice contains not only the price of

the rental equipment, but a statement that reads, "Customer has received complete safety instructions," which Jordan initialed. Another statement on the front of the invoice reads, "See Damage Waiver on Reverse Side. I hereby accept the damage waiver," and Jordan initialed the "yes" line. Jordan signed this agreement.

Second, Jordan benefitted from the activity of leasing the Bobcat loader and the trailer in that the equipment helped him perform his job. Jordan used the equipment for the purpose of completing a landscaping job on the day of his injury.

Third, it appears that the contract was entered into fairly. Jordan offered no evidence of fraud, duress, undue influence, lack of capacity, mutual mistake, or inequitable conduct sufficient to void the contract. Additionally, there is no evidence that Jordan attempted to change the terms of the contract.

In sum, the language of Diamond's exculpatory clause is written in simple and clear terms that are free from legal jargon. It is not inordinately long or complicated. As an experienced, full-time landscaping contractor, Jordan admitted in his deposition that he intended to rent a piece of equipment to enable him to complete his job, and that in his discussions with Diamond personnel, they instructed him how to operate the Bobcat loader. After those discussions, he entered into an agreement to rent the Bobcat loader. Ultimately, Jordan is bound to know the contents of the contract that he signed. *Carmichael v. Nationwide Life Ins. Co.*, 305 Ark. 549, 810 S.W.2d 39 (1991).

Therefore, in strictly construing this agreement against Diamond, and in taking the "total transaction" approach in *Plant, supra*, as well as the *Finagin* factors into account, we cannot say that the exculpatory clause contravenes public policy. We conclude that the exculpatory clause clearly sets out what negligent liability is to be avoided.

For their second point on appeal, the Jordans argue that the exculpatory clause in Diamond's contract is void for lack of mutuality of obligation. Specifically, Jordan contends that the terms of the provision do not impose an obligation upon Diamond and that any such obligation is imposed upon him as the lessee. In response, Diamond argues that mutuality of obligation is not required to enforce the exculpatory clause at issue.

The essential elements of a contract are: (1) competent parties, (2) subject matter, (3) legal consideration, (4) mutual

agreement, and (5) mutual obligations. *Tyson Foods, Inc. v. Archer*, 356 Ark. 136, 142, 147 S.W.3d 681, 684 (2004). We have recognized that mutuality of contract means that an obligation must rest on each party to do or permit to be done something in consideration of the act or promise of the other; thus, neither party is bound unless both are bound. *The Money Place v. Barnes*, 349 Ark. 411, 78 S.W.3d 714 (2002); *Showmethemoney Check Cashers, Inc. v. Williams*, 342 Ark. 112, 27 S.W.3d 361 (2000). A contract, therefore, that leaves it entirely optional with one of the parties as to whether or not he will perform his promise would not be binding on the other. *Id.*; *see also Townsend v. Standard Indus., Inc.*, 235 Ark. 951, 363 S.W.2d 535 (1962).

Diamond cites *Guinn v. Holcombe*, 29 Ark. App. 206, 780 S.W.2d 30 (1989), for the following proposition regarding mutuality of obligation:

> The validity of a contract does not always depend upon mutuality of obligation. Mutuality of obligation is ordinarily required in contracts *where the parties exchange a promise for a promise*, and each must be bound or neither is bound. *It becomes a nonissue when consideration has otherwise been conferred upon one of the parties.* A promise in exchange for performance does not require mutuality of obligation. *Eustice v. Meytrott*, 100 Ark. 510, 140 S.W. 590 (1911); *Carrico v. Delp*, 141 Ill. App. 3d 684, 95 Ill. Dec. 880, 490 N.E.2d 972 (1986); *Leeson v. Etchison*, 650 S.W.2d 681 (Mo. App. 1983); *Brack v. Brownlee*, 246 Ga. 818, 273 S.E.2d 390 (1980). *See* Restatement (Second) of Contracts § 79 (1981).

*Guinn*, 29 Ark. App. at 211, 780 S.W.2d at 33 (emphasis added). Mutuality of obligation involves the exchange of promises, and mutuality of obligations becomes "a nonissue" when performance is given. *Id.* In *Showmethemoney, supra*, and similar check-casher cases, we held that there was no mutuality of obligation because the customer contracted to arbitrate, while the check-cashing company had the option of arbitrating or filing suit in court.

In the present case, there is an exculpatory clause rather than an arbitration agreement. Here, mutuality of obligations became a nonissue because consideration was given by both parties at the time that the agreement was executed. Jordan fulfilled his obligation by signing an invoice and paying a rental fee of $185.87 to Diamond as consideration for Diamond's leasing the Bobcat loader and trailer to him and putting him in possession of

the leased equipment for a period of twenty-four hours in order to fulfill his responsibility for the landscaping project. Because the validity of the lease agreement between Jordan and Diamond depends upon performance by both of the parties, mutuality of obligations becomes a nonissue.

For their third point on appeal, the Jordans argue that the exculpatory clause was not supported by consideration. Specifically, the Jordans, citing *Capel v. Allstate Ins. Co.*, 78 Ark. App. 27, 77 S.W.3d 533 (2002), argue that while there was consideration for the rental equipment, the exculpatory clause is a collateral undertaking for which additional consideration is required.

This point on appeal is procedurally barred as it was not raised below. The Jordans never made the argument to the trial court that the exculpatory clause constitutes a collateral undertaking that requires additional consideration. In their reply brief, the Jordans maintain that they presented the argument in their motion for summary judgment and brief in support. Paragraph 8 of their motion for summary judgment states, "Plaintiffs further contend that the provision referred to in paragraph 5 above is void for lack of consideration." However, they do not make the "collateral undertaking" argument. It is well settled that we will not address arguments raised for the first time on appeal. *Miner v. State,* 342 Ark. 283, 288, 28 S.W.3d 280, 283 (2000). For these reasons, we are precluded from considering this point on appeal.

For their fourth point on appeal, the Jordans argue that the exculpatory clause was excluded from the contract. Specifically, the Jordans make the argument that because of the type size and placement on the back of the invoice, in addition to the fact that it was "a provision buried in the boilerplate on the reverse side of an invoice issued in a routine transaction," the agreement lacks "the degree of conspicuity to justify it from being considered as a matter of law an objective indicator of Jordan's agreement.

We have said that one is bound under the law to know the contents of the papers he signs, and he cannot excuse himself by saying that he did not know what the papers contained. *Carmichael v. Nationwide Life Ins. Co.*, 305 Ark. 549, 810 S.W.2d 39 (1991).

In considering the motion for summary judgment, the trial court had before it Jordan's agreement with Diamond where Jordan initialed that he "hereby accept[ed] the damage waiver," which was "on the reverse side." Jordan also signed the agreement

on a signature line below the following: "Signature denotes full acceptance of the agreement including waver [sic] of notice of theft. *(See reverse side.)*" Thus, there were two references to the reverse side of the agreement on the front page that Jordan signed.

Additionally, in his deposition, Jordan made reference to his signature on the contract and said, "There is something that has a lot of small writing on the back of the contract that I signed, but I cannot specifically say it would have been on the back."

■ Appellant also argues that this issue is ripe for the common-law maxim, *expressio unius est exclusio alterius*, which means that the expression of one implies the exclusion of others. Appellant provides no analysis how this maxim is applicable to the present case. Thus, in concluding, we hold that Jordan offered no evidence, or "proof with proof," that he did not know what he was signing when he entered into the lease agreement with Diamond. For these reasons, we affirm on this point.

For their fifth point on appeal, the Jordans argue that the trial court erred in determining that the terms of the provision expressly described the liability that was to be avoided. On this issue, the trial court ruled that "the language in the exculpatory clause sets out what negligent liability is to be avoided in very clear language."

As discussed in point one, we have held in *Edgin, supra,* and *Plant, supra,* that those exculpatory clauses were valid. In *Edgin, supra,* we concluded that the employer was not attempting to escape liability entirely, but that it was attempting to shield its clients from separate tort liability for those injuries that are covered by workers' compensation. Similarly, in *Plant, supra,* we held that an agreement releasing racetrack owners from liability for injuries sustained in the restricted area of a racetrack was valid. *See also Miller v. Pro-Transportation,* 78 Ark. App. 52, 77 S.W.3d 551 (2002) (holding that the exculpatory clause clearly and specifically set out the negligence that was to be avoided — that negligent liability for any injuries that the applicant may suffer while riding as a passenger in appellee's motor vehicle); *National Union Fire Insurance Company of Pittsburg, Pennsylvania v. Guardtronic,* 76 Ark. App. 313, 64 S.W.3d 779 (2002) (holding that the exculpatory clause sets out what negligence is to be avoided in that it is not the intention of the parties that appellees assume responsibility for any loss occa-

sioned by "malfeasance or misfeasance in the performance of the services under the contract, or for loss or damage from fire." *Id.*)

In the present case, we hold that the trial court's ruling is correct. Here, Diamond's lease agreement states that it "is not responsible for injuries or damages sustained in the use of these items whether the damages are due to neglect, mechanical failure, or any other cause whatsoever, regardless of who happens to be operating the equipment. [Jordan] assumes full liability from the time the equipment is rented until it is returned." This language releases Diamond from liability from any injuries due to "neglect, mechanical failure, or any cause whatsoever." Based upon this analysis, Jordan has failed to offer proof with proof that a fact-question exists, as the language of the exculpatory clause contemplate his negligence for which Diamond seeks to avoid liability. For these reasons, we affirm on this point.

For their sixth point on appeal, the Jordans argue that the exculpatory clause is unconscionable. Specifically, they contend that there is a question of material fact on this issue.

In support of their argument, the Jordans cite Ark. Code Ann. §§ 4-2A-103 and -108 (Repl. 2001). Unconscionability originated as an equitable doctrine. *See* 1 S. White & R. Summers *Uniform Commercial Code* § 4-2 (3d ed. 1988). The doctrine has been applicable in law courts in this state at least since the adoption of the Uniform Commercial Code in 1961. Act 185 of 1961, § 2-302. In the case at bar, it is doubtful at best that Ark. Code Ann. § 4-2-302 is strictly applicable, because Article 2 of the Code ordinarily applies only to transactions in goods. Ark. Code Ann. § 4-2-102. Nevertheless, the Code section on unconscionability has frequently been applied by analogy in non-code settings. *See Restatement (Second) of Contracts* § 208 comment a (1979).

We have stated that in assessing whether a particular contractual provision is unconscionable, the courts review the totality of the circumstances surrounding the negotiation and execution of the contract. *National Union, supra* (citing *State v. R & A Inv. Co.,* 336 Ark. 289, 985 S.W.2d 299 (1999)). Two important considerations are whether there is a gross inequality of bargaining power between the parties and whether the aggrieved party was made aware of and comprehended the provision in question. *Id.*

Here, we have already determined that the exculpatory clause was available for Jordan to read when he signed and initialed the agreement. Further, we have no evidence before us

that there was gross inequality of bargaining power, considering that Jordan sought out the services of Diamond and paid for the rental equipment after being shown how to operate it. Nor do we find where Jordan met proof with proof on the question of comprehending the provision at issue. By signing the document, it appears that he did.

Based upon the foregoing analysis in light of *Finagin, supra,* as well as our well-established standard of review regarding motions for summary judgment, we hold that the trial court properly granted Diamond's motion for summary judgment. Accordingly, we affirm.

HANNAH, C.J., and GLAZE and IMBER, JJ., dissent.

ANNABELLE CLINTON IMBER, Justice, dissenting. Over the course of the last one hundred years, this court has crafted a consistent doctrine of disfavor for exculpatory clauses.[1] In the most recent cases, the court has carved out limited exceptions to this general disfavor where the overall negative impact on public policy is mitigated. The majority opinion, while purportedly espousing the language in our long line of cases that emphasizes the harmful nature of exculpatory contracts, effectively overrules those cases. The opinion takes a position that has far-reaching negative consequences for public policy, does not correctly apply our precedent, and is founded on a misinterpretation of the challenged exculpatory clause and a misapplication of the law. I must dissent.

For over sixty years, this court has analyzed exculpatory contracts in light of their effects on public policy. In 1942, in the case of *Arkansas Power & Light Co. v. Kerr,* 204 Ark 238, 161 S.W.2d 403 (1942), we refused to enforce an exculpatory clause and stated, "A consciousness that failure to exercise due care will require compensation for injury to person or property is productive of caution and forethought by those in whose control rest the agencies that may cause damage." *Id.* at 241, 161 S.W.2d at 404. Our concern for the public policy implications of exculpatory clauses has continued through our present-day decisions. In *Plant v. Wilbur,* 345 Ark. 487, 47 S.W.3d 889 (2001), we reiterated that "this court has long stated a strong disfavor for exculpatory

---

[1] *See Gulf Compress Co. v. Harrington,* 90 Ark. 256, 119 S.W. 249 (1909).

contracts that exempt a party from liability, because of the public-policy concern encouraging the exercise of care." *Id.* at 493, 47 S.W.3d 893.

Furthermore, in deciding the validity of exculpatory clauses our court has required a thorough consideration of "the facts and circumstances surrounding the execution of the release." *Finagin v. Arkansas Dev. Fin. Auth.*, 335 Ark. 440, 455, 139 S.W.3d 797, 806 (2003). Under some limited circumstances, the court has been willing to enforce exculpatory clauses after a determination that the circumstances are such that the exculpatory clause does not discourage the use of ordinary care. In *Finagin*, the exculpatory clause was executed by a guarantor in favor of a lender. We observed that there was no evidence that the guarantors were unsophisticated businessmen, or that the agreements were entered into unfairly, and thus, enforcement of the exculpatory clause was allowed. *Id.* at 458, 139 S.W.3d 808. Moreover, the exculpatory clause only released the lender from liability for any "setoff, counterclaim, reduction, diminution of an obligation, or any defense of any kind or nature . . . ." *Id.* at 455, 139 S.W.3d 806. Notably, this release was not a release from *all* liability, only liability arising in the form of a setoff, counterclaim or defense. Likewise, we upheld a limited waiver of liability in *Edgin v. Entergy Operations, Inc.*, 331 Ark. 162, 961 S.W.2d 724 (1998), where we concluded that, because the waiver of liability was not a complete waiver of liability for work-related injuries and instead only a limited waiver of liability for *additional* remedies after workers' compensation, the agreement did not violate public policy by discouraging the employer or its clients from exercising reasonable care. *Id.* at 168, 961 S.W.2d 727.

Similarly, in the case of *Miller v. Pro-Transportation*, 78 Ark. App. 52, 77 S.W.3d 551 (2002), the Arkansas Court of Appeals upheld a clause releasing the trucking company from liability for negligence where the signor was the wife of the driver who sought to ride along with her husband. When the truck was involved in an accident, the wife sued the trucking company for damages she received as a result of the negligence of its employee (her husband) and argued that the exculpatory clause was invalid as against public policy. In analyzing the public policy question in connection with the release, the appellate court concluded that the circumstances of the case mitigated the public policy concerns:

> Finally, we think that the public policy of encouraging careful behavior that underlies the disfavor for such exculpatory clauses has

little application in the present case, where the allegedly negligent party, appellant's husband, was the driver of the vehicle and, therefore had far more compelling reasons to drive carefully than the avoidance of possible tort liability.

*Id.* at 55, 77 S.W.3d 554. In its analysis, the *Miller* court additionally examined the circumstances surrounding the lease, including that the appellant had previously ridden with her husband and knew the dangers involved in the trucking operation, and that the parties knew that injury could result from these activities, and as a result, the company required additional passenger insurance to cover the appellant's injuries.

This court reviewed similar factors in upholding the exculpatory clause in the case of *Plant v. Wilbur, supra.* In *Plant,* the appellant, Robert Plant, was injured by flying debris while watching an auto race from the pit area of the track. Before entering the pit, Plant signed an exculpatory agreement that released the track from all liability "whether caused by the negligence of the releasees or otherwise while the undersigned is in or upon the restricted area, and/or competing, officiating in, observing, working for, or for any purpose participating in the event." *Id.* at 490, 47 S.W.3d 891. When Mr. Plant brought suit against the track, the track moved for summary judgment, arguing that the release excused it from liability. The trial court granted summary judgment, and we affirmed its decision. In upholding the grant of summary judgment, this court focused on the specific circumstances surrounding the release, including the dangerous recreational nature of the activity and the number of people affected by the clause. First, we placed significant emphasis on the fact that the release was executed "in the context of a dangerous, recreational activity." *Id.* at 493, 47 S.W.3d at 893. The court noted,

> More importantly, as a participant, Plant was certainly familiar with the dangers inherent in the sport of auto racing. In fact, he admitted to having witnessed numerous wrecks that occurred during racing events. With this knowledge, Plant continued to voluntarily participate in this activity.

*Id.* at 495, 47 S.W.3d at 894. We also noted that the reach of these clauses was fairly limited in scope, as "they involve a very narrow segment of the public, rather than situations involving a public utility, a common carrier, or a similar entity connected with the public interest." *Id.* at 494, 47 S.W.3d 893.

The rationale adopted in *Plant* is easily distinguishable from the case at hand. Unlike the auto-racing activity, which is purely recreational, the type of activity at issue here is an integral part of Mr. Jordan's livelihood; that is, it involves his means of making a living. We approved the trial court's finding that recognized this distinction in *Plant*:

> I don't find that this is the type of enterprise in which the courts have acknowledged that it is improper to let them, — in other words, an enterprise that people have to rely upon like public transportation or other types of enterprises where people of necessity have to go just to get through life *and conduct regular business activities, making a living.* . . . his is recreation.

*Id.* at 495, 47 S.W.3d 894 (emphasis added). Additionally, while in *Plant* the affected segment of the public was small, the members of the public who could be affected by exculpatory clauses in contracts for the leasing of equipment is virtually limitless. If exculpatory clauses are less harmful in the context of recreational auto racing (because the participants are limited in number and are not compelled to participate, much less be in the restricted pit area), these clauses become progressively more threatening when they involve the daily activities of the general population. Enforcement of the exculpatory clause in the present case would have sweeping consequences for every future rental agreement in all areas of daily life.

Moreover, unlike in the cases of *Edgin* and *Miller*, the lessors of machinery have only a minimal motivation outside of the threat of liability to exercise ordinary care. The employers in *Edgin* still faced potential liability for their negligence pursuant to the workers' compensation statutes and were only relieved from the imposition of *additional* liability; as such, their motivation to act with due care and avoid liability would still be significant. In *Miller*, the wife signing the release could be fairly well-assured that her husband, who, as a representative of the company, was being released from liability, had her best interests in mind. Thus, he would continue to exercise reasonable care where she was concerned to keep her from harm, even without the threat of liability. In the present case, once Diamond is released from liability for harm to its customers, it has no significant motivation to maintain its machinery and business in a way that reduces the risk of harm to others. Instead, Diamond can operate without regard to who is put

at risk by its negligence, and without fear of any legal repercussion. In my view, encouraging such a lack of due care is unacceptable and should not be allowed.

The majority's treatment of the case at bar radically deviates from our court's traditional course of caution and disfavor of exculpatory clauses. While still echoing the notions of strict construction and general disfavor, the majority has created a test that is all too easy to overcome. The present situation does not involve any of the previous factors found to mitigate the general disfavor of exculpatory clauses; nor does it present any new indicia suggesting that the enforcement of similar clauses will not negatively impact public policy. In fact, the potential application of this case has sweeping negative effects on virtually every citizen of this state. The enforcement of broad and vague exculpatory clauses like the one at issue here erodes the very idea of ordinary care and provides an easy escape for entities who seek to avoid liability for their negligence.

Jordan rightfully suggests that enforcement of the exculpatory clause in this case will effectively overrule our past cases such as *Dessert Seed Co. v. Drew Farmers Supply, Inc.,* 248 Ark. 858, 454 S.W.2d 307 (1970), *Arkansas Power & Light, supra,* and *Farmers Bank v. Perry,* 301 Ark. 547, 787 S.W.2d 645 (1990). For example, in *Dessert Seed Co.,* a seed distributor sent the wrong seeds to the grower but then attempted to claim immunity from suit based on an exculpatory clause contained on the seed tag. We refused to uphold the agreement, noting that "the law should encourage 'caution and forethought' on the part of the [distributor]. To uphold the negligence clause in the contract would be more likely to produce the opposite result." *Id.* at 865, 454 S.W.2d 311. Similarly, in the case at bar, enforcement of the exculpatory clause would have the effect of discouraging lessors of machinery from exercising the use of ordinary care. In *Farmers Bank,* this court acknowledged the relationship of Farmers Bank as a provider of rental services to the renter of the lockbox, its customer, and held that the exculpatory agreement was insufficient to absolve the bank of liability for its negligence when the bank owed a duty of care towards its customer. Here, too, Diamond owes a similar duty of care to Jordan, its customer.

Instead of addressing Jordan's arguments and distinguishing these cases, the majority merely reaffirms the traditional notion that to avoid liability for negligence, "the contract must at least clearly set out what negligent liability is to be avoided." However,

a careful examination of the majority opinion shows that the Diamond exculpatory clause does not meet the requisite burden of clarity. The majority states, "we must ask whether Diamond clearly sets out what negligent liability is to be avoided," but then fails to provide *any* persuasive analysis explaining the precise scope of the clause. The majority simply continues to quote the vague and inconclusive language of the clause, as if its meaning will become clear with repetition. It does not. Further, as support for the conclusion that the scope of the exculpatory clause is clear, the majority states:

> As an experienced, full-time landscaping contractor, Jordan admitted in his deposition that he intended to rent a piece of equipment to enable him to complete his job, and that in his discussions with Diamond personnel, they instructed him how to operate the Bobcat loader.

This statement by the majority is a red herring. Jordan's subjective level of knowledge about the equipment he was renting provides absolutely no information on the scope of the exculpatory clause. The scope of the clause determines who is released and from what liability; assuming the same exculpatory clause is used in each contract, the scope will be the same. The issue of whether the scope of the clause is clear is an objective inquiry into the actual language of the clause. *See Farmers Bank, supra.* Thus, instead of analyzing the central questions of who is released from what liability, the majority delves into the merits of the underlying action, the negligent failure to instruct, as support for upholding the clause. But whether Jordan should ultimately *succeed* on his claim is not our concern; we are only to decide whether the exculpatory clause is enforceable so as to bar completely any cause of action for negligence against Diamond. Here, we arrive back at the question originally posed but never answered by the majority: whether Diamond clearly sets out what negligent liability is to be avoided. In light of the majority's complete failure to provide any explanation as to the scope of the ambiguous exculpatory clause, the answer must be no. This clause in no way meets that test and should not be enforced. *Plant v. Wilbur, supra; Farmers Bank v. Perry, supra.*

The majority further holds, albeit erroneously, that no question of fact exists on the issue of whether Jordan had knowledge of the potential liability he released in the contract with Diamond. In support of this conclusion, the majority notes that Jordan initialed the "yes" line stating, "I hereby accept the damage

waiver." What the majority fails to mention, however, is that the "limited damage waiver" clause actually states,

> If customer has agreed to purchase limited damage waiver, and takes all reasonable precautions to safeguard rented items and uses them in a safe and responsible manner, Diamond Equipment assumes the risk of direct physical loss or damage due to accidental damage to rental equipment except in the following circumstances:
>
> 1. Loss, damage or failure of tires and tubes under any circumstances.
>
> 2. If equipment is overloaded, operated above the rated capacity, rolled over, or if operating and safety instructions are not followed.
>
> 3. If customer fails to contact Diamond Equipment regarding maintenance and servicing of equipment, including but without limitation, lubrication, change of filters when required, and maintenance of adequate air, oil, water, or fuel pressures or levels.
>
> 4. If damage results from improper or unsafe operation or care whether caused by negligence, lack of training incompetence, or infidelity of the customer's employee or other person to whom rented items are entrusted. * * * * Damage waiver does not cover theft of equipment while in renter's possession.

Clearly, the "limited damage waiver" clause applies only to the issue of who is responsible for damage to the rented equipment and *not* whether Diamond is responsible for the injuries to Jordan. Hence, the fact that Jordan initialed acceptance of this clause is utterly irrelevant to our analysis of the exculpatory "Warranties and Liabilities" clause. The only other "proof" cited by the majority that Jordan knew he was releasing Diamond of all liability is the fact that Jordan signed the rental contract. First, I must disagree fundamentally with the idea that a mere signature, without more, is enough to show the party had knowledge of the potential liability he thereby released. Indeed, as the great majority of exculpatory contracts are signed documents, the *Finagin* requirement of "knowledge of the liability released" would become a virtual nullity if a signature was all that was required to show knowledge. Instead, the analysis should include "whether [the signor] was given a reasonable opportunity to read and comprehend that he

was signing a complete waiver of liability." *Plant*, 345 Ark. at 499, 47 S.W.3d at 897 (Glaze, J., dissenting). In the instant case, Diamond has not presented evidence at this stage of the proceeding, outside the signing of the rental agreement, to establish that Jordan read and comprehended that he was signing a complete waiver of liability.

Moreover, the majority incorrectly states that Jordan did not offer proof that he was unaware of the liability he released by signing the contract. To the contrary, during his deposition, Jordan was unable to say for certain that he remembered the exculpatory clause on his agreement. He stated, "There is something that has a lot of small writing on the back of the contract that I signed, but I cannot specifically say [the exculpatory clause] would have been on the back." Where, as here, the only evidence offered by Diamond in support of the exculpatory clause is the fact that Jordan signed the rental agreement, I believe the foregoing statement by Jordan is enough to raise a genuine issue of material fact as to whether Jordan was, in fact, "knowledgeable of the potential liability that is released." *Finagin v. Arkansas Dev. Fin. Auth.*, 355 Ark. at 458, 139 S.W.3d at 808. For that reason, if for no other, the circuit court erred in granting summary judgment in favor of Diamond.

In short, the majority opinion provides no clarity on the issue of the enforcement of exculpatory clauses. The majority wholly fails to determine the scope of the Diamond exculpatory clause, and then attempts to avoid this failure by making a public-policy-style argument that in fact goes to the merits of the case. In any event, this approach rejects our tradition of analyzing separately the questions of clarity of scope and public policy. Because the majority uses broad, sweeping language instead of analyzing the clause at issue here, this case will have far-reaching and disastrous consequences. Henceforth, exculpatory clauses will no longer be strongly disfavored or strictly construed against the parties relying on them. Instead, the only relevant inquiry will be whether or not the agreement has been signed. Under such a system, exculpatory clauses will become favored and broadly construed, and few, if any, will ever be declared unenforceable.

For all of the above-stated reasons, I respectfully dissent.

HANNAH, C.J., and GLAZE, J., join.