Cite as 2023 Ark. App. 297

# ARKANSAS COURT OF APPEALS
## DIVISION IV
### No. CV-20-628

| | |
|---|---|
| WILLIAM ANGEL, PATRICIA BELK, DOROTHY BROWN, ROBERT BROWN, ANTHONY BUGGS, JEAN CARTER, ALBERTA CARTWRIGHT, EUGENE CARTWRIGHT, FRANCES LOUISE CRAWFORD, BEATRICE EATON, QUEEN ESTER ROSS, PEARLIE FRANKLIN, ROSETTA FULLER, VERNA HICKEY, BARBARA MARSHALL, SHAMEKIA MARSHALL, NATHANIEL MARTIN, LINDA SANDERS, BOBBY LEE SMITH, FELISA STOKES, KATTIE MAE TAYLOR, FANNIE LEE WASHINGTON, MARTHA WASHINGTON, GLORIA WEBSTER, AND CLAUDE WILBORN **APPELLANTS** | Opinion Delivered May 24, 2023 <br><br> APPEAL FROM THE PHILLIPS COUNTY CIRCUIT COURT [NO. 54CV-18-216] <br><br> HONORABLE RICHARD L. PROCTOR, JUDGE |
| V. | |
| HELENA RENAISSANCE 1, L.P.; PIONEER PROPERTY MANAGEMENT, INC.; GAIL WADE; AND CORNELIUS BORUM **APPELLEES** | AFFIRMED IN PART; REVERSED AND REMANDED IN PART |

**BART F. VIRDEN, Judge**

Several current and former tenants of the Helena Heights Apartments (Helena

Heights), a multi-unit apartment building owned by appellee Helena Renaissance 1, L.P.

(Helena Renaissance), filed a complaint in the Phillips County Circuit Court alleging that Helena Renaissance, appellee Pioneer Property Management (Pioneer), and appellees Gail Wade and Cornelius Borum breached several covenants in their lease agreements and "created and maintained a nuisance in the common areas of the apartment complex." Their claims were based on the appellees' alleged failure to perform duties that they assumed under the lease agreement, including maintaining the building in "such a condition that all health and safety standards are met." The tenants chiefly complained that the appellees' poor maintenance of the building exposed them to toxic levels of mold, causing them to suffer a myriad of allergic reactions. The appellees moved for summary judgment, arguing that the tenants failed to offer proof of a causal relationship between the mold in the building and their reported symptoms. The appellees also argued that the tenants' other complaints about conditions of the building, including inoperable elevators, heat, and air conditioning, were not compensable under any of the claims in the complaint; and the tenants failed to offer proof of constructive eviction to sustain their claim for breach of the covenant of quiet enjoyment. The circuit court agreed and granted summary judgment on all the claims in the tenants' complaint. The tenants now appeal the circuit court's order. We affirm in part and reverse and remand in part.

I. *Factual Background*

In a complaint filed on August 16, 2018, the tenants alleged that they "were all residents of Helena Heights Apartments," and each of them entered into a lease agreement with Helena Heights through its agent, Gail Wade, who was the regional manager for

Pioneer. The tenants said that their leases incorporated the "Resident Handbook Rules and Regulations," which provides that management and the tenants will cooperate to maintain the apartments "in such a condition that health and safety standards are met." The tenants claimed that their leases also included "a third agreement under the approval of . . . [the] Phillips County Public Housing Agency," which provided that "Helena Heights and its owners and agents 'shall maintain the dwelling unit . . . as well as common areas.'"

The tenants alleged, nevertheless, that they encountered "persistent issues with mold and mildew in common areas" as well as "unsafe and unsanitary conditions leading to infestations by insects and rodents, water leaks in the walls of the building, unrepaired fire hazards, faulty electrical systems, trip and fall hazards, and sources of carbon monoxide exposure." They also said that the temperature in the apartments was occasionally "extremely hot or cold." The tenants claimed that as a result of these unsafe conditions, they individually suffered a host of alleged maladies, including

> acute respiratory infections, acute exacerbation of chronic obstructive pulmonary disease (COPD), shortness of breath, onset of asthma, acute irritation of existing asthma symptoms, hypertension, headaches, depression, anxiety, skin irritation, elevated blood-lead levels, insect or animal bites, nausea, vomiting, diarrhea, pneumonia, embarrassment at having visitors, and increased stress as a result of the poor maintenance and repair of the Helena Heights Apartments.

The tenants also asserted that the appellees breached the covenants in their leases because they "failed to repair or replace the damaged or defective areas of the premises" and "failed to maintain [their] apartments in such a condition that all health and safety standards [were] met." Helena Renaissance and its property managers, they said, "failed to maintain

3

[their] dwelling units in a safe and sanitary manner in accordance with HUD's Housing Quality Standards for Section 8 Housing Choice Voucher Program." Regarding their nuisance claim, the tenants asserted that the appellees "engaged in conduct that created a condition in the common areas of the apartment building that interfered with the quiet enjoyment of the areas of the property that the tenants had leased and so should be termed a nuisance." The appellees filed an answer and amended answers generally denying the material allegations in the complaint.[1]

On February 4, 2020, appellees Helena Renaissance, Pioneer, and Borum moved for summary judgment. First, they argued that summary judgment was warranted because the tenants, who claimed various medical issues related to the presence of mold in the apartment building, could not show entitlement to damages. Specifically, the appellees asserted that the tenants "failed to provide an expert witness qualified to link issues at Helena Heights to any medical issue," and the tenants' other complaints, including unpleasant odors and difficulty heating and cooling their apartments, did not "rise to a level of compensable injury under any of [their] five claims."

Alternatively, the appellees argued that summary judgment was warranted for several other reasons. First, they argued that three of the plaintiffs, including Anthony Buggs, Felicia Stokes, and Shamekia Martin, could not establish breach of the covenants in the lease or the

---

[1]The complaint was serially amended to add additional plaintiffs as well as to incorporate the findings of Joe Henry, their expert microbiologist, who inspected the mold conditions at Helena Heights.

Resident Handbook—as the complaint alleged in claim I and claim II, respectively— because they never signed a lease. The remaining plaintiffs also could not establish any breach of those covenants, the appellees said, because the leases that they signed included addendums that expressly absolved Helena Heights of liability for problems arising from mold or mildew. The appellees further argued that claim III in the complaint, which alleged breach of the housing choice voucher dwelling lease and HUD's housing quality standards, "must fail because there is no private cause of action under the federal law which created the Section 8 Project-Based Voucher Program" (in which Helena Heights participated). The tenants also could not prevail on their claim that the appellees had breached the covenant of quiet enjoyment in their leases because the tenants "failed to show actual or constructive eviction" because of the alleged issues in the apartment building. The appellees argued that claim V in the complaint, alleging that they created a nuisance condition in the common areas in the building, "has no applicability to this case based on the case law in Arkansas." Finally, Mr. Borum argued that he was entitled to summary judgment because he "[was] not a party to any lease agreement and has no personal liability in this matter."

The appellees attached several signed copies of the mold and mildew addendum to their motion for summary judgment. The addendum provided, in pertinent part, that

> [i]n consideration of the lease of the premises, Landlord shall not be responsible for any damages, liabilities, claims, or losses, incurred by residents or others inhabiting the premises arising out of or relating to mold or any other fungus or agent that may be associated with alleged defects in the premises, include, but not limited to, property damages, personal injury, adverse health effects, loss of income, emotional distress, death, loss of use or loss of value of the premises and resident hereby releases Landlord of the premises and resident hereby releases Landlord from the same. This

5

means that the resident shall not seek to hold the Landlord responsible under any legal theory for any damages whatsoever caused by mold or any other agent. [2]

The tenants filed a response to the summary-judgment motion on March 25, 2020. First, they argued that the appellees' claim that the tenants lacked expert testimony to prove damages "entirely ignores the opinions and testimony of [the tenants'] expert, Joe Henry, which sets forth the evidence demonstrating that conditions in the building existed that could lead to injuries and health issues experienced by [the tenants]." According to the tenants, Mr. Henry's opinions were "more than sufficient to demonstrate that evidence of general causation exists in this case as to create issues of material fact," and "[e]ven as to specific causation to each individual [tenant], there is sufficient evidence to allow the jury to reasonably conclude that the mold and mildew was a cause of the health problems [they] suffered[.]"

Second, the tenants argued that the mold and mildew addendum was unenforceable because it was not clearly incorporated into the lease agreement and conflicted with a version of the mold and mildew addendum that appeared in the Resident Handbook. The addendum in the handbook notably did not include the exculpatory language appearing in the version that the appellees signed. The tenants also argued that the addendum was an unenforceable exculpatory clause because the circumstances surrounding its execution (for

---

[2]Appellee Gail Wade did not join the motion for summary judgment or any other defensive pleading or motion filed in the circuit court. The record does not otherwise indicate, moreover, that she was served with a summons and a copy of the complaint in accordance with Ark. R. Civ. P. 4 (2022). Therefore, we consider the claims against her dismissed by application of Ark. R. Civ. P. 54(b), rather than on their merits.

each tenant) were unfair. Finally, the tenants asserted that genuine issues of material fact also remained as to "whether the addendum would apply to the entirety of a [tenant's] given residency at Helena Heights" because there was proof, at least regarding one of the tenants, that an executed addendum was not included with a second lease agreement that she signed during her stay at Helena Heights.

Third, the tenants argued that the mold and mildew addendum did not effectively disclaim the duty to maintain the building that the appellees collectively assumed in the Resident Handbook and through their participation in Low Income Housing Tax Credit Program, which requires the Arkansas Development Finance Authority (ADFA) to periodically inspect the premises to ensure compliance with uniform health and safety standards. In particular, the tenants asserted that the appellees "assumed [those] duties and responsibilities" by "virtue of their participation in the program administered by ADFA." The tenants also explained that they were not claiming that ADFA's standards created a private cause of action, as the appellees argued in their motion for summary judgment. Rather, they alleged that ADFA's requirements "were incorporated into the lease agreement, and in failing to comply with those requirements, [the appellees] [were] in breach of the agreements."

Fourth, the tenants argued that summary judgment was inappropriate because "significant issues of fact" remained as to whether they could prove that they were constructively evicted for purposes of their quiet-enjoyment claims. According to the tenants, "there is evidence supporting a conclusion that the intolerable conditions at Helena Heights

7

did lead some of the individual residents to abandon the property." Finally, the tenants insisted that their nuisance claims were "legally cognizable," and Mr. Borum was properly included in their lawsuit. In his role as the building manager at Helena Heights, Mr. Borum was "personally involved in the events surrounding [their] [injuries]."

The appellees filed a reply in which they maintained, inter alia, that there was no genuine issue of material fact regarding specific causation, and the mold and mildew addendum, in any event, shielded them from liability. They attached Mr. Henry's deposition in support of their argument regarding causation, pointing out that he agreed that the apartment building did not "have a systemic [mold] issue" and that elevated mold counts were present only in the apartments occupied by appellants Robert Brown and Pearlie Franklin Brown. The appellees also highlighted portions of Mr. Henry's deposition in which he agreed that "air sampling for mold spores does not and cannot evaluate potential health risks," and he would advise clients who suspected mold exposure to undergo further evaluation and testing. The appellees further argued that other depositions attached to the tenants' response (from the tenants themselves) were insufficient to establish either general or specific causation.

On August 4, 2020, the circuit court issued a letter opinion explaining its reasons for granting the appellees' motion for summary judgment. First, the circuit court agreed that there was no genuine issue of material fact regarding causation. The court found that the tenants' claims that their medical issues were related to the presence of mold was "purely speculative." Specifically, the court found as follows:

In this case, health issues vary from another, [from] coughing [to] headache, and most [tenants] have different issues. Mr. Henry, [the tenants'] expert, "set forth evidence demonstrating that conditions in the building existed that **could** lead to injuries and health issues experienced by the [tenants]." In Mr. Henry's deposition, pages 50 and 51, [it says] "that a person suspecting mold exposure is causing symptoms would be advised to undergo evaluation and testing and have an allergy workup." He also stated "that if one removes the exposure, the symptoms should go away."

. . . .

With the information presented, this court cannot say that there is a question of fact [on] the issue of causation. Each claim of [the tenants] related to medical issues is purely speculative with no foundation in science or medicine. The only evidence, that of Mr. Henry, is, by his own words, speculative, and should be followed up by testing for an accurate determination. In addition, Mr. Henry states that some [people] are affected while others may not be affected [by mold]. The court agrees with Helena Heights that complaints of mold annoyance are not compensable.

The circuit court also ruled that even if there was an issue of fact as to causation, the mold and mildew addendum shielded the appellees from liability. The court found that the language in the mold and mildew addendum "is clear that there is a waiver of any responsibility by the landlord under [any] legal theory for damages caused by mold or mildew," and the addendum "would cover the lease, the handbook, and [the] HUD lease."

In addition, the circuit court found that there was no remaining genuine issue of material fact on the tenants' quiet-enjoyment claims. According to the court, there was "no factual basis on the issue of quiet enjoyment" because there were "some tenants still in the apartments, some [that] never signed a lease at all, and no evidence was presented to rise to an action on [that] issue." The circuit court added that the tenants' quiet-enjoyment claims "should also be covered by the [mold and mildew] addendum for most [tenants] and there would not be a remedy for those who resided there without a lease."

Regarding the tenant's nuisance claims, the circuit court found that "the law of nuisance, unreasonably interfering with the use and enjoyment of the lands of another, has no applicability under these circumstances" because there was "(1) no substantial proof that the medical issues of the tenants were caused by the alleged mold; (2) no showing that the [appellees'] conduct was not unreasonable [sic]; and (3) no proof, but mere speculation, linking the actions of the [appellees] to the complaints of the [tenants]."

The circuit court incorporated all the foregoing findings in an order dismissing the case with prejudice entered on August 24, 2020. The tenants now appeal that order. We affirm in part and reverse and remand in part.

## II. *Standard of Review*

"The burden of sustaining a motion for summary judgment is always the responsibility of the moving party." *Wade v. Bartley*, 2020 Ark. App. 136, at 8, 596 S.W.3d 555, 560. "Further, all proof submitted must be viewed favorably to the party resisting the motion, and any doubts and inferences must be resolved against the moving party." *Id.* "When a movant makes a prima facie showing of entitlement, the respondent must meet proof with proof by showing a genuine issue as to a material fact." *Id.* "Summary judgment is not proper, however, where evidence, although in no material dispute as to actuality, reveals aspects from which inconsistent hypotheses might reasonably be drawn and reasonable minds might differ." *Id.* Indeed, "[t]he object of summary-judgment proceedings is not to try the issues, but to determine if there are any issues to be tried[.]" *Id.* "[I]f there is any doubt whatsoever, the motion should be denied." *Id.*

10

III. *Discussion*

To quote the appellants' brief: "Appellants are a group of over twenty elderly low-income people who are living, or who lived, in an apartment building at 217 Biscoe Street, Helena, Arkansas, known as '"Helena Heights."'" From the evidence in the case, the conditions in which they were living could be described as appalling. The question presented in this case below and now to our court is this: can the tenants seek legal redress for those conditions? It is significant and will be further explained in this opinion that the appellants, plaintiffs below, were some twenty-four individuals, each suing in his or her own right. While they certainly allege similar and overlapping claims, this is not a class-action lawsuit, and if one or more of the plaintiffs' claims cannot be sustained, it does not defeat the claims of the others. Therefore, each claim must be examined separately.

As such, we preliminarily affirm the circuit court's dismissal of the breach-of-contract claims alleged by appellants Anthony Buggs, Shamekia Martin, and Felicia Stokes. There is no evidence in the record that those three plaintiffs paid rent, signed a lease, or otherwise could state a claim that the covenants in the lease were breached.[3] *See Elsner v. Farmers Ins. Grp., Inc.*, 364 Ark. 393, 395–96, 220 S.W.3d 633, 635–36 (2005).

A. Causation – Breach of Contract

We now turn to the remaining tenants' breach-of-contract claims. First, they argue that the circuit court erred when it determined that the testimony of a medical expert was

---

[3]Anthony Buggs testified, in fact, that he "never signed a written lease agreement or [made] any rental payments to [the] Helena Heights Apartment[s]."

necessary to raise a question of fact regarding "specific causation" or, in other words, whether the tenants' exposure to mold caused the illnesses that they claimed in their complaint. They say that the relationship between mold and respiratory symptoms would be well within the common knowledge of a jury or, alternatively, that Joe Henry's expert testimony was sufficient to establish the causal relationship. The appellees respond that the tenants cannot establish causation without expert testimony establishing (1) the type and levels of mold that are generally harmful to humans (general causation); and (2) that the tenants' alleged injuries were, in fact, caused by exposure to harmful levels of mold (specific causation).

The appellees point us to *Richardson v. Union Pacific Railroad Co.*, 2011 Ark. App. 562, at 3, 386 S.W.3d 77, 80, a toxic-tort case, in support of their argument that the circuit court's order should be affirmed. In *Richardson*, we agreed that a plaintiff claiming damages from exposure to a toxic substance "must adduce evidence of both general and specific causation." *Id*. General causation, we said, "addresses whether a particular agent can cause a particular illness," while specific causation "addresses whether that agent in fact caused the particular plaintiff's illness." *Id*. at 3–4, 386 S.W.3d at 80. Applying these definitions, we held that causation in toxic-substance cases "requires more than mere proof of exposure to above-ambient levels of the alleged toxin, and instead requires evidence of the levels of exposure that are harmful to human beings generally, as well as the plaintiffs' actual level of exposure to the defendant's toxic substance." *Id*. at 2–3, 386 S.W.3d at 79. We ultimately upheld the circuit court's order granting summary judgment because the appellant did not provide

reliable expert testimony that his cancer had been caused by exposure to benzene while he was a railroad employee.

While the circuit court did not cite *Richardson* in its letter opinion as authority for its grant of summary judgment, it is clear from the letter opinion that the circuit court relied on *Richardson* for its reasoning. We must recall the specific causes of action set forth by the plaintiffs. The plaintiffs alleged five causes of action. Four of the causes of action were based on breach of covenants in the lease agreement, and the fifth cause of action was for nuisance. It is not a matter of semantics to note that the plaintiffs did not allege any cause of action sounding in tort, much less toxic tort, against Helena Heights. As such, *Richardson* is inapposite here, and the circuit court's analysis of, and reliance on, *Richardson* was in error. Further, we have held that a circuit court errs when it grants summary judgment on a breach-of-contract claim because proof of causation was lacking. *See Crumpacker v. Gary Reed Constr., Inc.*, 2010 Ark. App. 179, at 4, 374 S.W.3d 162, 164. Indeed, nominal damages may be recovered "for a breach of contract unaccompanied by any actual damage," *W. Union Tel. Co. v. Aubrey*, 61 Ark. 613, 33 S.W. 1963 (1896), and in our view, the possibility of an award of nominal damages is sufficient to preclude summary judgment in this case. *See Glenn v. HealthLink HMO, Inc.*, 360 S.W.3d 866, 872 (Mo. Ct. App. 2012). Because of our decision, we need not discuss the specifics and intricacies of what damages might be available to individual tenants as the result of a breach of covenants set forth in the complaint. Therefore, we reverse and remand the circuit court's order granting summary judgment to the remaining appellees.

B. The Mold and Mildew Addendum

Because we are reversing and remanding to the circuit court the causes of action for breach of contract, we must address the mold and mildew addendum that was included in the lease agreement. The tenants argue that the appellees cannot avail themselves of the mold and mildew addendum as a shield to their contractual responsibilities because they expressly assumed the duty to maintain the apartment building in a "healthful condition" through covenants in the lease. They also argue—apparently in the alternative—that the appellees implicitly assumed a duty to maintain the premises in a healthful condition when they attempted to repair the causes of wet conditions that were favorable to mold as well as any mold that later developed.[4] The tenants further contend that the addendum was an unenforceable exculpatory clause because the circumstances surrounding its execution (for each tenant) suggest that they did not know the potential liability that was released. In

---

[4]The tenants also offhandedly suggest that the circuit court erred when it granted summary judgment on their claims against Cornelius Borum because "an individual employed by a corporation [who is] personally involved in the events surrounding an injury . . . may be sued." Mr. Borum was personally involved, they say, because he attempted (and ultimately failed) to repair the poor conditions alleged in their complaint. We reject this argument. While Mr. Borum's signature appears on a lease renewal (and mold and mildew addendums,) he was not a party to the lease agreements and, therefore, cannot be liable for breaching it. "Arkansas recognizes the general rule that where an agent names his principal and does not exceed his authority when contracting on the principal's behalf, the agent is not personally liable upon the contract unless the agent agrees to be." *McCullough v. Johnson*, 307 Ark. 9, 11, 816 S.W.2d 886, 887 (1991). The tenants do not make any argument here that Mr. Borum agreed to be personally liable. Similarly, they make no argument regarding the personal liability of appellee Pamela Wade, the property manager at Helena Heights. Thus, we affirm the dismissal as to Borum and Wade. Thus, we affirm the dismissal of Borum.

response, the appellees argue that they did not assume any duty to keep the apartment building free of mold and, in fact, "specifically disclaimed any responsibility for the presence of mold" in the mold and mildew addendum.

We agree with appellees that, with certain exceptions, landlords generally do not have the common-law duty to repair or maintain leased premises. A landlord may contractually agree to repair or maintain leased premises, however, and that is what the lease agreement herein provides. In reviewing the lease agreement, we agree with the tenants that the appellees expressly assumed the duty to repair mold conditions in the mold and mildew addendum itself, and the exculpatory clause, which purports to release the appellees from liability under "any legal theory," is unenforceable. Therefore, we hold that the circuit court erred when it determined that the tenants waived the appellees' liability for the alleged breaches of the covenants in the lease.

Arkansas has long recognized the common-law doctrine of caveat lessee, which provides that "unless a landlord agrees with his tenant to repair leased premises, he cannot, in the absence of statute, be compelled to do so or be held liable for repairs." *Hurd v. Hurt*, 2017 Ark. App. 228, at 4, 519 S.W.3d 710, 712. The state of Arkansas law regarding tenants' rights is summarized by Professor Howard Brill in his treatise Arkansas Law of Damages, where he writes as follows:

> The Arkansas Residential Landlord-Tenant Act of 2007 modified the common law but does not place upon the landlord a duty of habitability to provide minimum living standards. Arkansas may be the only state not to impose such a requirement. In contrast with the Uniform Act that formed the basis for the Arkansas statute, the law removes most reciprocal obligations of the landlord. For example, although a tenant

15

must keep his unit clean and safe, the landlord has no corresponding obligation to keep the common areas in the same condition. The tenant must use plumbing, electrical, sanitary, and other fixtures in a reasonable way; however, the landlord has no duty to maintain them. The Act has a section of landlord remedies, but no section on tenant remedies. Thus, Arkansas has maintained a strict application of the common law of caveat lessee, placing almost no burden on the landlord to provide for the safety, sanitation, or condition of the leased property.

1 Howard W. Brill and Christian H. Brill, *Arkansas Law of Damages* § 25.1 (6th ed. 2014).

Indeed, the caveat lessee doctrine remains codified in Arkansas Code Annotated section 18-16-110 (Repl. 2015), which provides as follows:

No landlord or agent or employee of a landlord shall be liable to a tenant or a tenant's licensee or invitee for death, personal injury, or property damage proximately caused by any defect or disrepair on the premises absent the landlord's:

(1) Agreement supported by consideration or assumption by conduct of a duty to undertake an obligation to maintain or repair the leased premises; and

(2) Failure to perform the agreement or assumed duty in a reasonable manner.
In this case, we do not need to look further than the mold and mildew addendum itself to determine that the appellees agreed to maintain the apartment building in a manner that kept it free from mold. While the addendum obligates the tenants to perform simple tasks (such as running bathroom fans and opening windows), it also makes it rather clear that the appellees will undertake repairs of mold conditions that are beyond the tenants' control. Specifically, the addendum provides that a tenant must

notify the landlord immediately of any circumstances involving excess moisture or water leakage such as plumbing leaks or drips, sweating pipes of toilet tanks, as well as any overflows in the bathroom, kitchen, or laundry facilities (if applicable), especially in cases where the overflow may have permeated walls, floors, carpeting, or other floor coverings or cabinets.

Additionally, tenants must "notify the landlord of any mold growth on surfaces inside the dwelling unit that cannot be removed or controlled by the tenant." The tenants also agreed to "allow the landlord to enter the dwelling unit *to inspect and make any necessary repairs*." (Emphasis added.) Several residents testified, moreover, that the appellees attempted to make repairs to control the moisture in their respective apartments. Therefore, we conclude the appellees entered into an agreement to make mold-related repairs.

Additionally, the appellees, having assumed that duty by agreeing to make mold-related repairs, cannot rely on the exculpatory clause to disclaim liability for breaching it. In Arkansas, exculpatory contracts are typically used to "absolve [parties] in advance for the consequences of [their] own negligence," and as such, they "are not favored by the law." *Jordan v. Diamond Equip. & Supply* Co., 362 Ark. 142, 148–49, 207 S.W.3d 525, 530 (2005). The disfavor "is based upon the strong public policy of encouraging the exercise of care"; therefore, "they are to be strictly construed against the party relying on them." *Id.*

Exculpatory clauses must also have the essential elements of a contract, including (1) competent parties; (2) subject matter; (3) legal consideration; (4) mutual agreement; and (5) mutual obligations." *Id.* at 152–53, 207 S.W.3d at 533. Mutuality of obligation means "that an obligation must rest on each party to do or permit to be done something in consideration of the act or promise of the other; thus, neither party is bound unless both are bound." *Id.* at 153, 207 S.W.3d at 533. "A contract, therefore, that leaves it entirely optional with one of the parties as to whether or not he will perform his promise would not be binding on the other." *Id.*

17

The exculpatory clause in the mold and mildew addendum is sweeping in its scope, and it disclaims liability for more than negligent conduct. It provides, in fact, that "the [tenant] shall not seek to hold the landlord responsible *under any legal theory* for any damages whatsoever caused by mold or any other agent." (Emphasis added.)

Courts in other jurisdictions have invalidated similar exculpatory clauses for lack of mutuality of obligation. The Illinois Supreme Court's decision in *Jewelers Mutual Insurance Co. v. Firstar Bank Illinois*, 820 N.E.2d 411 (Ill. 2004), is particularly instructive. In that case, diamonds and loose jewelry were stolen from three safety-deposit boxes that Firstar Bank leased to jewelry dealers. The safety-deposit-box agreements provided that the relationship of the parties was that of landlord and tenant, as opposed to bailor and bailee. The agreement also contained the following exculpatory clause:

> It is understood that said bank has no possession or custody to, nor control over, the contents of said safe and that the lessee assumes all risks in connection with the depositing of such contents, that the sum mentioned is for the rental of said safe alone, and *that there shall be no liability on the part of said bank, for loss of, or injury to, the contents of said box from any cause whatever unless lessee and said bank enter into a special agreement in writing to that effect*, in which case such additional charges shall be made by said bank as the value of the contents of said safe, and the liability assumed on account thereof may justify. The *liability of said bank is limited to the exercise of ordinary care to prevent the opening of said safe by any person not authorized* and such opening by any person not authorized shall not be inferable from loss of any of its contents.

*Id.* at 412–13 (emphasis added). None of the jewelers entered the "special agreement" mentioned in the exculpatory clause, and Jeweler's Mutual Insurance Company, which insured two of the boxes, sued Firstar for breach of contract and negligence. *Id.* at 413. Relying on the exculpatory clause, the bank successfully moved for summary judgment.

18

The Illinois Supreme Court ultimately reversed the lower court's order granting summary judgment. The court observed that the exculpatory clause was ambiguous because in the first sentence, "the [bank] disclaims liability for any loss whatsoever," and in the second sentence, "defendant assumes one particular liability." *Id.* at 415. That is, the bank "must exercise ordinary care to prevent unauthorized persons from accessing the box." *Id.* The supreme court went on to hold, however, that

> [w]hatever the meaning of the exculpatory clause, it clearly cannot be applied to a situation in which [the bank] is alleged to have breached its duty to exercise ordinary care to prevent unauthorized persons from opening the box. This is a specific duty that [the bank] assumed in the contract, and it formed the heart of the parties' agreement. *A party cannot promise to act in a certain manner in one portion of a contract and then exculpate itself from liability for breach of that very promise in another part of the contract.*

*Id.* at 415–16 (citations omitted) (emphasis added); *see also Com. Movie Rental, Inc. v. Larry Eagle, Inc.*, 738 F. Supp. 227, 230 (W.D. Mich. 1989) (holding that the contract at issue was "void for lack of mutuality because it completely exempts Commercial from all liability for a breach").

We find the Illinois Supreme Court's opinion persuasive here. The appellees, having agreed to make mold-related repairs in the manner that we described, could not validly disclaim any liability for breaching that agreement. Accordingly, we hold that the exculpatory clause in the mold and mildew addendum is unenforceable.

## C. Quiet Enjoyment

The lease agreement between the tenants and the appellees expressly includes a covenant of quiet enjoyment. The lease provides, in pertinent part, that "landlord covenants

19

and agrees with [the] tenant that upon the tenant paying rent, and observing and performing all of the terms, covenants and conditions on [the] tenant's part to be observed and performed under this Lease, [the] tenant may peaceably and quietly enjoy the premises, subject nonetheless to the terms and conditions of this lease." In addition, the law in Arkansas is clear that every residential lease has an implied covenant of quiet enjoyment. *See Walnut Ridge Golf Club, Inc. v. City of Walnut Ridge*, 2010 Ark. App. 372, at 7, 375 S.W.3d 679, 683. That is only the beginning of the inquiry. What is covered by the implied or explicit promise? And most significant, must the tenant be evicted—actually or constructively—for the promise to be breached?

Arkansas law does not provide much guidance on whether constructive eviction is necessary for a lessee to maintain a cause of action for breach of the covenant of quiet enjoyment in a lease. Our supreme court has addressed the issue in the context of warranty deeds, holding that "with some exceptions (not applicable here), the rule is that an action for damages on breach of a covenant of quiet enjoyment cannot be maintained where there has been no eviction," *Riddle v. Udouj*, 371 Ark. 452, 457, 267 S.W.3d 586, 590 (2007) (quoting *Thompson v. Dildy*, 227 Ark. 648, 651, 300 S.W.2d 270, 272 (1957)), and the suggestion that the rule should be applied to the landlord-tenant relationship has appeared only in Justice Fogelman's dissenting opinion in *Trace X Chemical, Inc. v. Highland Resources, Inc.*, 265 Ark. 468, 476, 579 S.W.2d 89, 93 (1979) (Fogelman, J., dissenting). The circuit court apparently had the view that a breach does not occur unless a tenant is forced to

abandon the premises, and the appellants do not appear to take issue with that conclusion here.

Rather, the tenants confine their argument to the sufficiency of their proof, arguing that several of them offered deposition testimony that the conditions at Helena Heights forced them to leave their apartments. We agree. The circuit court here broadly granted summary judgment on *all* the tenants' claims because there were "*some* tenants still in the apartments . . . and no evidence was presented to rise to an action on [the quiet enjoyment] issue." (Emphasis added.) The court apparently took an all-or-nothing approach, treating this case as though it was filed as a class action. It was not. Several of the tenants, in fact, alleged that they were forced to leave their apartments due to the unhealthy conditions. Accordingly, we reverse and remand so that the circuit court may address each tenant's claims individually.

## D. Nuisance

Finally, the tenants argue that the circuit court erred by granting summary judgment on their nuisance claim. They assert that a person creates a nuisance if he or she "uses, and employs, his own property in such an unwarrantable and unreasonable manner as to annoy, injure, or endanger the comfort, repose, health, or safety of another in the use of his property," and they insist they came forward with evidence demonstrating a remaining genuine issue of material fact on whether the appellees created a nuisance by allowing "conditions for mold and insects to flourish." The appellees respond that the tenants' allegations failed to state a cause of action for nuisance because "the law of nuisance has no applicability to a landlord-tenant relationship."

The appellees are correct; however, the court was misguided in its findings. The circuit court rejected the nuisance claim on a finding that the tenants failed to offer proof supporting the elements of the claim. Nevertheless, we "may affirm a circuit court where it has reached the right decision, albeit for the wrong reason, so long as the issue was raised and the record was developed below," *Ark. State Bd. of Election Comm'rs v. Pulaski Cnty. Election Comm'n*, 2014 Ark. 236, at 12, 437 S.W.3d 80, 87, and, as indicated above, the appellees argued in their motion for summary judgment that the law of nuisance does not apply to the landlord-tenant relationship.

Arkansas defines a nuisance as "conduct by one landowner that unreasonably interferes with the use and enjoyment of the *lands of another* and includes conduct on property that disturbs the peaceful, quiet, and undisturbed use and enjoyment *of a nearby property*." *Aviation Cadet Museum v. Hammer*, 373 Ark. 202, 207, 283 S.W.3d 198, 203 (2008) (emphasis added). This definition plainly does not include the type of nuisance claim that the tenants advanced in the complaint, in which they alleged nuisances affecting their use and enjoyment of the *same property* owned by the offending landowner—here Helena Renaissance.

Our view is in accord with other jurisdictions that have held that a tenant cannot raise a cognizable nuisance claim against his or her landlord. In *Wiesman v. Hill*, 629 F. Supp. 2d 106 (D. Mass. 2009), for example, a resident of a public housing project filed a complaint against the housing authority that owned her apartment building as well as several housing-authority employees. Among other things, the complaint alleged a nuisance claim against

22

the defendants for failing to abate the behavior of a disruptive neighbor. The district court, applying Massachusetts law, dismissed the claim because "a nuisance claim requires two separately owned parcels of real property." *Id*. at 114. More particularly, "a tenant cannot sue her own landlord for a nuisance on the property that the tenant rents from the landlord." *Id*. (internal citation and quotation marks omitted). Rather, "a suit for breach of the covenant of quiet enjoyment is the proceeding a tenant may bring against her landlord for interference with the use and enjoyment of the rented property." *Id*.

A more recent decision from the United States District Court for the District of Kansas is consistent with *Weisman*. In *Coe v. Cross-Lines Retirement Center, Inc*., ___ F. Supp. 3d ___, 2022 WL 17555300, at *5 (D. Kan. Dec. 9, 2022), the district court dismissed nuisance claims brought by tenants of an apartment complex that catered to senior citizens. The court observed that "the vast majority of courts," including the Third Circuit and the Tenth Circuit, "have held that an action for private nuisance is designed to protect *neighboring landowners* from conflicting uses of property" *Id*. at *4. The court also summarized its reasoning for dismissing the tenants' nuisance claims in the following instructive manner:

> The court believes that the Kansas Supreme Court would likely adopt the reasoning of most courts in determining that an action for private nuisance is unavailable to tenants against their landlords. In arriving at this conclusion, the court agrees with the Third and the Tenth Circuits' reasoning that nuisance law historically is meant to regulate conflicts between neighboring or at least separate land uses, not issues originating on one's own property. Plaintiffs, as tenants, are not otherwise powerless against [the] defendants as a landowner would be against a neighbor. Negotiation, withholding rent, and suing under any number of recognized theories available to tenants against landlords . . . are perfectly available to them. Adding private nuisance to the list of available actions would be needlessly cumulative while endangering

future lessors with liability for purposely leasing cheap premises which openly come with defects.

*Id.* at *5. Therefore, because Arkansas defines a private nuisance in the same manner as the "vast majority" of other courts, and that definition has been persuasively applied to exclude tenants' nuisance claims against their landlords, we affirm the circuit court's order on this point.

IV. *Conclusion*

We affirm the circuit court's order of summary judgment in dismissing the tenants' claims for damages for nuisance. Except as to the three tenants noted above, we reverse the order of summary judgment on the tenants' breach-of-contract claims.

Affirmed in part; reversed and remanded in part.

THYER and HIXSON, JJ., agree.

*David A. Hodges*, for appellants.

*Munson, Rowlett, Moore & Boone, P.A.*, by: *Mark S. Breeding* and *Zachary Hill*, for appellees.