Cite as 2025 Ark. App. 452

# ARKANSAS COURT OF APPEALS
## DIVISION III
#### No. CV-23-736

| | |
|---|---|
| MIGHTY GOOD SOLUTIONS, LLC; AND BENJAMIN RENDO <br><br> APPELLANTS <br><br> V. <br><br> THE RETAIL FIRM, LLC <br><br> APPELLEE | Opinion Delivered October 1, 2025 <br><br> APPEAL FROM THE BENTON COUNTY CIRCUIT COURT [NO. 04CV-21-1710] <br><br> HONORABLE XOLLIE DUNCAN, JUDGE <br><br> AFFIRMED |

### BART F. VIRDEN, Judge

This appeal arises from a contractual dispute between appellants Mighty Good Solutions, LLC; and Benjamin Rendo and appellee The Retail Firm, LLC, involving the parties' agreement to terminate their business relationship. Mighty Good and Rendo appeal from the circuit court's grant of summary judgment in favor of Retail Firm. We affirm.

### I. *Facts and Procedural History*

Mighty Good is a Kansas company that produces personal health and hygiene products. Rendo is Mighty Good's owner and president. Retail Firm is a Bentonville, Arkansas, company that offers retail consultation and brand advocacy to vendors that want to sell products to Walmart and Sam's Club.

On December 3, 2019, Mighty Good and Retail Firm entered into a marketing services agreement ("MSA") wherein Retail Firm agreed to provide consulting services to

Mighty Good, to assist Mighty Good in developing and cultivating relationships with Walmart and Sam's Club, and to further assist Mighty Good with marketing, sales functions, sales analysis, and strategic functions. In exchange, Mighty Good agreed to pay a monthly commission fee to Retail Firm based on a percentage of the net sales of Mighty Good's products to Walmart and Sam's Club.

The MSA expressly states that it "shall [not] be construed to imply a joint venture, partnership, or principal-agent relationship" between the parties. Further, neither party "shall have the right, power or authority to obligate or bind the other in any manner whatsoever" except as otherwise agreed to in writing. Additionally, the MSA could be terminated for "cause" upon fifteen days' notice. "Cause" included "the breach, non-performance, or violation of any material provision, term or condition" of the MSA.

Just months after the parties executed the MSA, the onset of the COVID-19 global pandemic created a need for specific types of consumer goods and products. Mighty Good analyzed the possibility of sourcing raw materials to produce pandemic-driven products, including hand sanitizers. Mighty Good ultimately sought Retail Firm's assistance with procuring Walmart and Sam's Club buyers for its hand sanitizers and other personal protective products. Retail Firm began negotiating with Sam's Club for the purchase of Mighty Good's hand sanitizers in the spring of 2020. On April 10, 2020, Mighty Good, through Rendo, executed its first "Supplier Agreement" with Sam's Club.[1]  Mighty Good

---

[1]The Supplier Agreement is part of the "Sam's Club General Merchandise Agreement" and must be accepted by the supplier, approved by Sam's Club, and executed

2

subsequently executed a second and a third Supplier Agreement with Sam's Club on September 1 and December 7, 2020, respectively.[2]

Among other terms and conditions, the Supplier Agreement expressly states that the "execution of this Agreement by both Supplier and Company does not impose on Company any obligation (and Company has no obligation) to purchase or take delivery of Merchandise (or to enable the sale or delivery of Merchandise to any customer) or to use any services of Supplier." "No Company representative has authority to order Merchandise except an Authorized Buyer through an Order issued pursuant to and subject to the terms of this Agreement." "Order" is defined as "any written or electronic purchase order for Merchandise issued by Company through an Authorized Buyer." A Supplier may only "receive Orders and send Company invoices electronically" using the Company's "EDI" electronic transmission system, and a Supplier "may ship only after receipt of an Order." Further, the "Company may cancel all or any part of an Order at any time before shipment."

The Supplier Agreement includes the following "NO BUSINESS EXPECTATION" provision:

> Company has no obligation and makes no promises to purchase any minimum amount of Merchandise from Supplier. Projections, past purchasing history and representations about quantities to be purchased are not binding on Company, and Company shall not be liable for any act or expenditure (including but not limited to expenditures for equipment, labor, materials, packaging or capital expenditures) by Supplier in reliance on them.

---

by both parties before the supplier may receive purchase orders to sell products to Sam's Club.

[2]The general terms of each of these Supplier Agreements are substantively the same.

Further, the Supplier Agreement, "the Standards (as may be amended from time to time), and Order, and the User Agreement constitute the full understanding of the parties, a complete allocation of risks between them and a complete and exclusive statement of the terms and conditions of their agreement." "All prior agreements, negotiations, dealings and understandings, whether written (including any electronic record) or oral, regarding the subject matter hereof, are superseded by this Agreement." "If there is a conflict of terms between this Agreement, an Order, the Standards, the User Agreement, business terms, business programs, processes, directives or policies incorporated into this Agreement, this Agreement shall be the controlling document."

On May 13, 2020, Retail Firm sent an email to Mighty Good, exclaiming, "Let's FREAKING GOO!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!" Retail Firm included email correspondence between Retail Firm Representative Chad Goss and Sam's Club Merchant Jessica Surber from earlier the same day. In an email to Surber, with subject line "Booking POs for Hand Sanitizers," Goss wrote:

> To secure all of the line time at the plants we need to show a booking PO [purchase order], just to validate that Sam's will actual[ly] be placing orders. Can you create item numbers based on the 3 new item forms that are attached, then issue a booking "dummy" PO to Mighty Good via EDI? We really need it by COB tomorrow if possible.

Goss included an informational chart representing three hand-sanitizer items in 32-, 64-, and 128-ounce sizes. Surber asked, "Will an email work for commitment?" Goss confirmed, "Yes, email will work for commitments today if you could just reply to this note. (But booking POs

4

by Monday would be awesome!)" Surber replied, "You have my commitment to order the minimum quantities on the below items beginning 5/22, assuming all compliance requirements are met." This included a five million "minimum commitment" for the 32-ounce sanitizer product.

On the basis of Surber's commitment, Mighty Good "expended significant sums, efforts, and time to procure, manufacture, and ship" its hand-sanitizer product for anticipated orders from Sam's Club. Beginning in May 2020 and through that summer, Sam's Club "made a number of purchases" for the 32-ounce product. By October 2020, Sam's Club stopped placing orders for this product, and by the end of 2020, Sam's Club had purchased only 33 percent of the "minimum commitment" and "no further orders appeared forthcoming." Mighty Good says it "was confused and concerned about Sam's Club's conduct given that Sam's Club was undoubtedly required to order the minimum quantities as set forth in its May 2020 commitment." According to Mighty Good, Retail Firm "feigned ignorance" and provided no explanation for why Sam's Club stopped placing orders for the 32-ounce hand sanitizer.

By the beginning of 2021, Mighty Good "was becoming frustrated with the increasing costs, lack of orders, and ongoing risk it was incurring," which it attributed to "Retail Firm's poor consultative advice regarding the idle Sam's Club inventory."[3] Mighty Good

---

[3] On February 24, 2021, Rendo copied Retail Firm on an email, stating, "With $2M in sunken sanitizer production + $3M-plus in inventory we're still holding from the October wipes + $3M in Sam's hand wipes we were told to bring in that haven't moved, I can't keep investing in programs that don't produce revenue."

"considered Retail Firm's dealings with Sam's Club and Walmart buyers to be not in the best interests of Mighty Good" and "to be a non-performance under the MSA." According to Mighty Good, Retail Firm "continued to demand significant commission fees despite the fact that it was not fulfilling its obligations under the MSA." As a result of Mighty Good's "dissatisfaction with Retail Firm and its performance under the MSA," Mighty Good and Retail Firm began negotiating a termination and transition of services agreement (the "Termination Agreement").

The parties' Termination Agreement, effective May 10, 2021, terminated all prior agreements between the parties, including the MSA, and released all causes of action and claims arising on account of and out of those prior agreements. The Termination Agreement, among other things, states:

> Pursuant to the Prior Agreements, Mighty Good acknowledges and agrees that it owes The Retail Firm an amount equal to $1,109,648.23 ("Commissions Owed"), and that the Retail Firm has, in exchange for the covenants and undertakings of Mighty Good and the Guarantor (as defined below) under this Agreement and the Guaranty (as defined below), agreed to reduce the payments owed to The Retail Firm under the Prior Agreements to an amount equal to $1,000,000 (the "Termination Payment").

It further states, "At the time of the execution of this Agreement, Mighty Good shall deliver to The Retail Firm a guaranty duly executed by Benjamin Rendo (the "Guarantor" in a form attached hereto as Exhibit A (the "Guaranty")."

A string of email correspondence during April and May 2021 shows that Mighty Good and Retail Firm worked through counsel to draft, revise, and finalize the Termination Agreement and accompanying Guaranty. On April 22, counsel for Mighty Good offered the

$1 million "Termination Payment" from Mighty Good to Retail Firm and Rendo's personal guaranty of said payment. On May 10, Retail Firm's counsel accepted the material terms of Mighty Good's proposed Termination Agreement and provided slight revisions to other parts of the agreement. On May 11, Mighty Good's counsel proposed minor changes to the Termination Agreement, including Mighty Good's offer to make the first $20,000 Termination Payment by May 15, 2021. Also on May 11, after some back and forth, Mighty Good's counsel again offered Rendo's personal guaranty and stated that Rendo "is standing behind" it. On May 12, after more back and forth, counsel for Mighty Good provided the final draft of the Termination Agreement to Retail Firm, stating, "I would like to get this finalized today." On May 13, Mighty Good's counsel demanded "a signed agreement" so that Mighty Good could timely initiate the first $20,000 Termination Payment. Later that evening, counsel for Retail Firm confirmed Retail Firm's acceptance of the offer, stating that he had two out of the three signatures needed. On May 14, counsel for Retail Firm provided Mighty Good's counsel with a copy of the Termination Agreement signed by Retail Firm. That same day, counsel for Mighty Good responded to the signed copy by asking for another signature on behalf of Retail Firm, noting, too, that she had circulated the agreement to her client for signature. On May 17, counsel for Retail Firm confirmed that Retail Firm had received Mighty Good's first Termination Payment of $20,000, provided Mighty Good's counsel with copy of the Termination Agreement with the final signature, and requested a countersigned copy from Mighty Good. Counsel for Retail Firm attempted to follow up with Mighty Good's counsel by email on May 19, and again on May 28, to no avail.

On June 4, 2021, Mighty Good sent a letter accusing Retail Firm of engaging in serious breaches of its obligations to Mighty Good in violation of the MSA. Despite the parties' several months of good-faith negotiations to end their relationship, Mighty Good maintained that it "has been terribly disappointed" with Retail Firm's performance under the parties' MSA and stated that it had "recently discovered a further and even more serious breach" of Retail Firm's duties and obligations to it. Mighty Good explained that it had "reached out to Sam's Club directly to request that it resume submitting purchase orders consistent with the commitment made in May 2020." According to Mighty Good, "it came as a complete shock" when, on May 19, 2021, Sam's Club provided it with email communications documenting its position that, in November 2020, Retail Firm "had released Sam's Club from its prior obligation to purchase the 32 oz. hand sanitizer products from Mighty Good."

The subject email correspondence was sent between Sam's Club Merchant Jessica Surber and Retail Firm Representative Chad Goss on November 19–20, 2020. On November 19, Surber sent an email to Goss with the subject line "Mighty Good 32oz." In the email, Surber said, "Please confirm we are OK to walk away from the remaining pallets of the 32oz."[4] The next day, Goss replied, "Yes, our focus is on moving into the 64oz as soon as possible and alleviating our holding costs."

---

[4]Surber later testified in her deposition that the Supplier Agreements do not require Sam's Club to obtain vendor consent to change a commitment; the decision is fully within Sam's Club's discretion. Surber said, nevertheless, she usually tries to be a "good business

Mighty Good claimed that prior to May 19, 2021, it did not know that Sam's Club was not buying any more 32-ounce hand sanitizer and accused Retail Firm of knowing, but withholding, such information. In light of its discovery of Retail Firm's "further breach" and "additional bad acts," Mighty Good informed Retail Firm that it would not be honoring its obligations under the Termination Agreement, demanded settlement in the amount of $4.1 million, and demanded a refund of the $20,000 first Termination Payment. Mighty Good thereafter commenced an arbitration proceeding in California, purportedly under the MSA, alleging that Retail Firm breached its duties of good faith and fair dealing to Mighty Good and that Retail Firm committed tortious interference with Mighty Good's business expectancy with Sam's Club.

On July 20, 2021, Retail Firm filed this action against Mighty Good and Rendo for breach of the Termination Agreement and Guaranty. Retail Firm alleged that it suffered damages resulting from the breaches, "including but not limited to the Termination Payment, costs of suit, attorneys' fees, and pre- and post-judgment interest" and sought judgment against Mighty Good and Rendo, "jointly and severally, for the Termination Payment, plus costs, attorneys' fees, and pre- and post-judgment interest, and also an order staying the arbitration proceeding[.]" The circuit court ultimately entered an order enjoining the arbitration "from continuing or proceeding in any manner, pending the outcome of this

partner" and thus sometimes communicates with the vendor or its representative about a change.

case." Mighty Good and Rendo answered the complaint and counterclaimed. Mighty Good asserted causes of action for (1) breach of the MSA, (2) negligence, (3) tortious interference with a business expectancy, and (4) fraudulent inducement. Rendo also asserted fraudulent inducement.

On December 22, 2022, Retail Firm moved for summary judgment on its complaint and on Mighty Good and Rendo's first amended counterclaims. In support, Retail Firm submitted several documents, including (1) the April–May, 2021 email correspondence between the parties' counsel in negotiating the Termination Agreement; (2) the affidavit of Charlie Tocco, Mighty Good's former COO from November 2020–January 2021, stating that Mighty Good knew in November–December 2020 that it was giving up the 32-ounce sanitizer to sell a 4-pack sanitizing-wipes product to generate more revenue; (3) September–October 2020 email discussions about ideas to transition from the 32- and 128-ounce sanitizers to the 64-ounce sanitizer and 4-pack sanitizing wipes, including October 2020 emails with Rendo and Mighty Good employees; and (4) a January 2021 email response from Mighty Good relating to a request by Sam's Club for an additional markdown on 32-ounce sanitizers, stating, "We are already sitting on $2M of 32oz's they aren't ordering."

In opposition, Mighty Good submitted, among other things, Rendo's affidavit stating that Sam's Club stopped ordering 32-ounce sanitizer in October 2020 and that when Mighty Good asked Retail Firm in December 2020 why Sam's Club was not ordering the 32-ounce sanitizer, Retail Firm said that the 32-ounce was "dead" at Sam's Club, which suggested to Mighty Good that Sam's Club was reneging on its commitment. Mighty Good also submitted

10

additional emails between Retail Firm and Sam's Club Merchant Jessica Surber from November 20, 2020, including Surber's response to Retail Firm's inquiry about the possibility of accelerating "the 64oz shipments," to which Surber replied, "Not without a markdown on the 32oz or 128oz, we are heavy on WOS [weeks of supply] on both items."

On January 25, 2023, as the summary-judgment briefing was concluding, Mighty Good and Rendo filed second amended counterclaims asserting the same causes of action but adding allegations that "Retail Firm, the expert when it comes to the inner workings of Sam's Club, never informed Mighty Good, both before and after the commitment was reached, that the commitment could be withdrawn unilaterally[.]" Mighty Good alleged that Retail Firm, instead, "advised Mighty Good to rely and act upon the commitment, source all available materials, to lock in prices based on the amount of product specified in the commitment and to set and execute a demanding production schedule to meet the 5,000,000 minimum quantity commitment." Mighty Good claimed that in reliance on Retail Firm's advice, it "sustained damages of approximately $2,531,429.82, its sunk costs associated with the 32 oz. commitment."

Mighty Good and Rendo further alleged that they were in a relationship of trust and confidence with Retail Firm and that Retail Firm made false representations, including the fact that Retail Firm did not know why Sam's Club ceased placing orders and withheld that Retail Firm unilaterally—and without Mighty Good's authorization—released Sam's Club from its commitment to purchase 32-ounce hand sanitizer from Mighty Good. Mighty Good alleged that it learned in discovery, and particularly from Chad Goss's deposition testimony,

11

that Retail Firm also withheld its purportedly held belief that Sam's Club's commitments are not actual commitments but merely an "intention" that Sam's Club may cancel. Mighty Good further alleged that Retail Firm withheld the fact that Sam's Club did not condition its purchase of hand wipes from Mighty Good on a requirement that Mighty Good release its 32-ounce hand-sanitizer commitment. As a defense to enforceability, Mighty Good and Rendo claimed that the Termination Agreement and Guaranty were improperly induced by Retail Firm's fraudulent misrepresentations.

While Mighty Good and Rendo's second amended counterclaims were pending, the circuit court held a hearing and granted Retail Firm's original summary-judgment motion.[5] At the conclusion of the February 7, 2023 hearing, the circuit court ruled from bench, in pertinent part, as follows:

> I think [the Supplier Agreement] is probably one of the more important documents in the whole case, because the Supplier Agreement lays out, clearly, what Sam's is not obligating itself to. . . . I wanted to hear that there's no question that the Supplier Agreement, which says what it says and is very clear in what it says, was between [Mighty Good] and Sam's. Because it is and because, then, we had a Termination Agreement that was signed by [Retail Firm], it was offered by [Mighty Good], it was accepted and signed by [Retail Firm], . . . the Defendant, Mighty Good, at least, then, started performing under that agreement.
>
> I think there is, clearly, a Termination Agreement, there was a meeting of the minds and I don't think that the claim of fraudulent inducement flies

---

[5]In its written order, the circuit court noted Retail Firm's pending motion to strike Mighty Good and Rendo's second amended counterclaims and ordered that the motion to strike "shall be held in abeyance until after the time to respond has passed." On March 2, 2023, the circuit denied Retail Firm's motion to strike, allowing Mighty Good and Rendo to go forward on their second amended counterclaims.

12

because of the Supplier Agreement that [Mighty Good] entered into with Sam's Club.

> So, the Supplier Agreement, even though it's argued late in the process, I think creates a real problem for the defense and [Mighty Good's] position.

On March 16, 2023, Retail Firm filed a second motion for summary judgment on Mighty Good and Rendo's second amended counterclaims, which the circuit court heard on June 26, 2023. At the conclusion of that hearing, the court ruled as follows:

> Well, I think the result today is the same as it was last time. Summary Judgment will be granted in favor of [Retail Firm].

> At the time of the release by [Retail Firm] of Sam's commitment, the facts were the same. The Termination Agreement was entered into. The thing is, at that time, prior to these jury verdicts,[6] as far as [Retail Firm] knew the commitments weren't binding, and as far as [Mighty Good] knew, or should have known, the commitments were not binding on Sam's, because that's what the Supplier Agreements, that [Mighty Good] signed, say and emphasi[ze], more than once, that they are not binding.

> Now, in a breach of contract, based on Sam's actions, maybe there would have been an action against—directly against Sam's Club. If they, in fact, pursued some course of action that made the agreement become binding, when the clear language says it's not, we don't have to buy, this is not binding us to purchase your stuff, and that email about "LET'S FREAKING GO!" I

---

[6]The court's reference to "jury verdicts" relates to Mighty Good's reliance on breach-of-contract actions brought in federal court by vendors of similar hand sanitizer products against Sam's Club involving Sam's Club "commitments" and Supplier Agreements. *See K7 Design Grp., Inc. v. Walmart, Inc.*, 143 F.4th 931, 937 (8th Cir. 2025) (affirming judgment and holding that whether communications between Sam's and supplier constituted "Order" under supplier agreement was question for jury).

The court correctly rejected Mighty Good's misplaced reliance on *K7 Design Group* and similar cases, noting that the instant case involves Mighty Good and Retail Firm's agreement to terminate their business relationship, and not the contractual relationship between Mighty Good and Sam's Club.

13

mean, I don't think that changes anything except be first in line with your stuff when Sam's needs it the most. So, I just don't think anything changes, at all. And, as a matter of fact, when the Termination Agreement was entered into between these two parties, that I found binding last time, I mean, it seems to me that if [Mighty Good] is claiming they thought the commitment was binding, at that time, and they let it go then, that kind of defeats their claim that now they realize, well, it really it wasn't binding after all, but Retail Firm should have told them that. So, . . . what they released in their Termination Agreement was a commitment they thought was binding and, yet, now they learn it's not really binding and that, somehow, makes their position worse. I don't think so.

So, Summary Judgment will be granted in favor of [Retail Firm].

On July 11, 2023, the circuit court entered its final written order granting Retail Firm's motion for summary judgment and awarding judgment in favor of Retail Firm against Mighty Good and Rendo, jointly and severally, in the amount of $980,000 plus postjudgment interest in the amount of 7.25 percent per annum. This appeal followed.[7]

## II. *Standard of Review*

On appeal, we decide if the grant of summary judgment was appropriate by determining only whether the evidence left a material question of fact unanswered. *City of Bethel Heights v. Gregory A. Kendrick Revocable Living Tr.*, 2017 Ark. App. 78, at 3–4, 515 S.W.3d 135, 137–38. The burden of sustaining a motion for summary judgment is on the

---

[7]On July 20, 2023, Retail Firm moved for attorney's fees pursuant to Arkansas Code Annotated section 16-22-308 (Repl. 1999). On December 22, 2023, the circuit court entered an order awarding Retail Firm fees against Mighty Good and Rendo, jointly and severally, in the amount of $96,332. On January 19, 2024, Mighty Good and Rendo filed an amended notice of appeal seeking review of the fee award, which is the subject of the companion case in No. CV-24-239, also handed down today. *See Mighty Good Sols., LLC v. The Retail Firm, LLC*, 2025 Ark. App. 453, ___ S.W.3d ___.

movant. *Id.* at 4, 515 S.W.3d at 138. We view all proof submitted in the light most favorable to the party resisting the motion, resolving any doubts and inferences against the moving party. *Id.* Once the moving party has established a prima facie entitlement to summary judgment by affidavits or other supporting documents, the opposing party must meet proof with proof and demonstrate the existence of a material issue of fact. *Id.* Summary judgment is not proper where the evidence, although in material dispute as to actuality, reveals aspects from which inconsistent hypotheses might reasonably be drawn and reasonable minds might differ. *Anaya v. Ford*, 2012 Ark. App. 8, at 4.

III. *Arguments on Appeal*

Mighty Good and Rendo challenge the circuit court's grant of summary judgment in favor of Retail Firm, raising two points on appeal. First, Mighty Good and Rendo argue that the circuit court erroneously determined that the email commitment from Sam's Club Merchant Jessica Surber did not contractually obligate Sam's Club to order a minimum quantity of Mighty Good's 32-ounce hand sanitizer. This argument suffers from a fatal misapprehension of the circuit court's rulings in the summary-judgment proceedings.

The circuit court's grant of summary judgment was premised on its determination that the parties entered into a valid and enforceable Termination Agreement and accompanying Guaranty, which Mighty Good and Rendo breached when they repudiated and refused to honor their payment obligations thereunder, resulting in damages in the amount of $980,000—the balance of reduced commission fees Mighty Good owed to Retail

Firm under the Termination Agreement. Mighty Good did not deny that the $1,109,648.23 commission based on actual sales claimed by Retail Firm had not been earned.

As noted, the Termination Agreement expressly terminated all prior agreements between the parties, including the MSA, and released all claims and causes of action arising out of those prior agreements. To overcome the Termination Agreement's release and to resurrect their counterclaims arising out of the MSA, Mighty Good and Rendo claimed that they were fraudulently induced by Retail Firm into the Termination Agreement and Guaranty. Specifically, they alleged that Retail Firm made false representations that misled Mighty Good into believing that Surber's email commitment to order a minimum quantity of 32-ounce hand sanitizer was binding on Sam's Club and that Retail Firm failed to disclose material information, including that Retail Firm, in fact, held the opposite belief that Surber's commitment was merely an "intention" to order 32-ounce hand sanitizer and that Sam's Club can, and often does, change its "commitments." Mighty Good and Rendo claimed that they relied on these alleged false representations and omissions in negotiating the Termination Agreement and Guaranty.

Contrary to Mighty Good and Rendo's assertion, the circuit court did not decide that Surber's email commitment was not, in fact, contractually binding on Sam's Club. Rather, it concluded that in light of the plain language in Mighty Good and Sam's Club's Supplier Agreements, which Rendo signed on Mighty Good's behalf, Mighty Good and Rendo could not establish the essential elements of their fraud claims and that Retail Firm was therefore entitled to summary judgment as a matter of law. More on this to come. In short, we agree

16

with what the circuit court made clear—the question whether the side commitment by a Sam's Club merchant is binding on Sam's Club is not properly presented in this matter. Accordingly, we must decline Mighty Good and Rendo's invitation to weigh in on the issue raised in their first point on appeal.

In their second point on appeal, Mighty Good and Rendo challenge the circuit court's grant of summary judgment as to Retail Firm's claims for breach of the Termination Agreement and Guaranty, arguing that the parties did not form a valid contract.[8] They contend that material questions of fact exist with respect to whether there was a meeting of the minds between the parties because Mighty Good and Rendo did not physically sign the written Termination Agreement and Guaranty. We disagree.

The essential elements of a contract are (1) competent parties; (2) subject matter; (3) legal consideration; (4) mutual agreement; and (5) mutual obligation. *Altice USA, Inc. v. Johnson*, 2023 Ark. App. 120, at 7, 661 S.W.3d 707, 714. It is well settled that a court cannot make a contract for the parties but can only construe and enforce the contract that they have made; and if there is no meeting of the minds, there is no contract. *City of Bethel Heights*, 2017 Ark. App. 78, at 4, 515 S.W.3d at 138. A meeting of the minds does not depend on the subjective understanding of the parties but instead requires only objective manifestations of mutual assent for the formation of a contract. *Hagans v. Haines*, 64 Ark. App. 158, 164,

---

[8]Mighty Good and Rendo do not challenge the elements of breach and resulting damages on appeal. *See, e.g.*, *Stone v. Read*, 2022 Ark. App. 349, at 16 (reciting essential elements of breach-of-contract claim: the existence of an agreement; breach of the agreement; and resulting damages).

984 S.W.2d 41, 44 (1998); *see also Pine Hills Health & Rehab., LLC v. Matthews*, 2014 Ark. 109, at 7, 431 S.W.3d 910, 915 (explaining that using objective factors for determining mutual assent means using "objective indicators of agreement and not subjective opinions"). The meeting of minds, which is essential to the formation of a contract, must be determined from the parties' expressed or manifested intention—that is, from a consideration of their words and acts. *Hagans*, 64 Ark. App. at 164–65, 984 S.W.2d at 44. A party's manifestation of assent to a contract may be made "wholly by spoken words or by conduct." *Childs v. Adams*, 322 Ark. 424, 433, 909 S.W.2d 641, 645 (1995). Moreover, parties may become bound by the terms of a contract even if they do not sign it, if their assent is otherwise indicated, such as by the acceptance of benefits under the contract or by the acceptance of the other party's performance. *Altice USA, Inc.*, 2023 Ark. App. 120, at 8, 661 S.W.3d at 715. Whether a meeting of the minds has occurred is an issue of fact. *Anaya*, 2012 Ark. App. 8, at 5.

Applying these standards, we cannot conclude that reasonable minds might differ as to whether the parties reached an agreement. Considering the evidence of the parties' negotiations surrounding the Termination Agreement objectively, the circuit court found, and we agree, that Mighty Good offered the final version of the Termination Agreement and asked Retail Firm to sign it. The terms of the agreement, at that point, were fixed and in writing. Retail Firm indicated that it was "good with this most recent version" and accepted it by signing and delivering a copy of the executed agreement to Mighty Good—thus, both parties assented. *See Little v. Miller*, 212 Ark. 356, 359–60, 205 S.W.2d 475, 477 (1947) (holding that letter constituted offer, which was accepted, thus consummating the contract

18

irrespective of any failure to sign a formal written agreement). Mighty Good, moreover, went a step further and began performing the contract by making the first $20,000 Termination Payment.

Mighty Good and Rendo attempt to create a factual dispute to defeat summary judgment where none exists. For example, they point to an email dated May 28, 2021, in which counsel for Retail Firm requested an update from Mighty Good's counsel, noting that "[t]his Settlement is not resolved until we have received your client's signature." This communication, however, was made two weeks after Retail Firm had already accepted Mighty Good's final version of the written agreement, returned its signed copy to Mighty Good, and asked for a countersigned copy, *and* after Mighty Good had started to perform its obligations by submitting its first Termination Payment. Additionally, Mighty Good and Rendo point to conflicting statements about what Retail Firm did with Mighty Good's first $20,000 Termination Payment—whether it was deposited into an escrow account or into Retail Firm's operating account. Similarly, whatever Retail Firm may have done with the Termination Payment is immaterial. The parties had already made a contract.

Further, Mighty Good's reliance on the Termination Agreement's signature blocks does not support a reasonable conclusion that Mighty Good's failure to sign invalidates the agreement. *See Parker v. Carter*, 91 Ark. 162, 167, 120 S.W. 836, 838 (1909) ("A written contract, not required to be in writing, is valid if one of the parties signs it and the other acquiesces therein."). Nor does Mighty Good's contention that the MSA imposed a "universal signature requirement" for all modifications to the agreement. The Termination

19

Agreement did not modify the MSA; it terminated it. The MSA, moreover, expressly provided that *notwithstanding* the requirements for modification, the agreement may be terminated for "cause" at any time by either party upon written notice.

Rendo contends that the Guaranty "specifies that Rendo had to sign it for it to go into effect," relying on the following statement: "Mighty Good shall deliver to The Retail Firm a guaranty duly executed by Benjamin Rendo[.]" This statement, like the Termination Agreement's signature page, does not support a reasonable conclusion that Rendo's failure to sign invalidates the agreement. *See Altice USA, Inc.*, 2023 Ark. App. 120, at 8, 661 S.W.3d at 715 (a party "may become bound by the terms of the contract even if they do not sign it, . . . if their assent is otherwise indicated, such as by acceptance of benefits under the contract").

The circuit court, likewise, properly rejected Rendo's statute-of-frauds argument. Whether the Guaranty was barred by the statute of frauds is a question of law, which we review de novo. *Rovnaghi v. Rovnaghi*, 2022 Ark. App. 203, at 4, 646 S.W.3d 163, 166–67. Arkansas Code Annotated section 4-59-101(a)(2) (Repl. 2023) provides:

> Unless the agreement, promise, or contract . . . upon which an action is brought is made in writing and signed by the party to be charged therewith, . . . no action shall be brought to charge any . . . [p]erson, upon any special promise, to answer for the debt, default, or miscarriage of another[.]

The statute of frauds, however, does not apply when, as in this case, the debt is preexisting, and the third party's promise is founded on new consideration. *See Barnett v. Hughey Auto Parts, Inc.*, 5 Ark. App. 1, 3–4, 631 S.W.2d 623, 625 (1982) ("[E]ven if the debt preexists, a

subsequent promise of a third party to pay it is deemed original and enforceable if founded on a new consideration of benefit moving to the promisor.").

Rendo's promise to pay the debt of Mighty Good was founded on new consideration. Rendo acknowledged as much when, on April 22, 2021, his counsel wrote that Rendo "will agree to give a guaranty if the Commissions Owed are reduced to $1,000,000." And on May 11, 2021, when counsel affirmatively stated that "the consideration for the guaranty is the reduction in amounts owed" and that "[w]e are providing a guaranty (which my client is standing behind) in exchange for $100k of [reduction in] commissions." This reduction in debt, moreover, was for Rendo's own benefit as Mighty Good's owner and principal officer. *See Barnett*, 5 Ark. App. at 4, 631 S.W.2d at 625 (holding that third party's promise to pay debt of corporations in exchange for creditor's agreement not to sue corporations was supported by new consideration of benefit to promisor, who was a principal officer and majority owner of the corporations; as such, he had an unusual interest in the success of the corporate enterprise). The reduction in debt, moreover, was not the only new consideration of benefit to Rendo. Among other things, Retail Firm agreed to release Rendo, as an officer and member of Mighty Good, from certain liability, agreed to forward to Rendo any communications received from Walmart and Sam's Club, and agreed not to disparage Mighty Good's officers, including Rendo. Accordingly, we hold that the Guaranty falls outside the statute of frauds and is enforceable against Rendo.

Finally, Mighty Good and Rendo argue, in the alternative, that the Termination Agreement and Guaranty, even if validly executed, are nevertheless unenforceable because

they were induced through Retail Firm's fraudulent misrepresentations and omissions of material fact relating to the 32-ounce hand-sanitizer commitment. As noted, Mighty Good and Rendo alleged both (1) that Retail Firm made false representations that misled Mighty Good and Rendo into believing that Surber's email commitment created a binding obligation on Sam's Club to purchase a minimum quantity of 32-ounce hand sanitizer and (2) that Retail Firm failed to disclose material information concerning Retail Firm's own view, from a position of superior knowledge, that Surber's email commitment was not actually a commitment but merely an "intention" to order, which did not contractually obligate Sam's Club to order a minimum quantity of 32-ounce hand sanitizer. Mighty Good and Rendo contend that summary judgment was inappropriate because the circuit court's "reasoning was entirely based on its flawed view" of Mighty Good's Supplier Agreements with Sam's Club and Surber's email commitment and because the record is "replete with disputed facts." We disagree.

To establish fraud, five essential elements must be proved: (1) a false representation of a material fact; (2) knowledge or belief that the representation is false or that there is insufficient evidence upon which to make the representation; (3) intent to induce action or inaction in reliance upon the representation; (4) justifiable reliance on the representation; and (5) damage suffered as a result of the reliance. *Wilson v. Gillentine*, 2021 Ark. App. 46, at 4, 618 S.W.3d 145, 147. Regarding fraudulent inducement, our supreme court has said:

> Fraud cannot be an agreement. It is an imposture practiced by one upon another. It may be used as an inducement to enter into an agreement. Defendant does not claim that he entered into an agreement that affects the

validity of the contract, but that he was induced by false representations to enter into the contract. If that be true the validity of the contract is not assailed, but its very existence is destroyed. To constitute fraud by false representation there must be a representation of alleged existing fact; that representation must be false in fact; it must be made with intent to deceive, and the person to whom it is made must believe it.

*Allen v. Overturf*, 234 Ark. 612, 615–16, 353 S.W.2d 343, 345 (1962) (quoting *Scarsdale Pub. Co. - The Colonial Press v. Carter*, 116 N.Y.S. 731, 735 (1909)). Representations are considered fraudulent when the one making them either knows them to be false or, not knowing, asserts them to be true. *Morris v. Rush*, 77 Ark. App. 11, 17, 69 S.W.3d 876, 880 (2002). A grant of summary judgment on a claim of misrepresentation is appropriate when a plaintiff does not produce specific facts that the defendant knew his representations were false. *Id.*

We hold that, in this case, the circuit court properly determined that Retail Firm did not fraudulently induce Mighty Good and Rendo into the Termination Agreement and Guaranty. The circuit court found that Mighty Good and Sam's Club's Supplier Agreement is "probably one of the more important documents in the whole case," noting that the agreement "says what it says and is very clear in what it says." The language in the Supplier Agreement plainly states that a supplier has "no business expectation" in the purchase of any minimum amount of product by Sam's Club and that any "representations about quantities to be purchased *are not binding*" on Sam's Club. As already explained, the court did not analyze this contractual language to determine whether Surber's email commitment is, in fact, binding on Sam's Club. Rather, it considered evidence of the Supplier Agreements, and what those agreements clearly say, to conclude that, at the time of the Termination

Agreement, "as far as Retail Firm knew," Surber's commitment was not binding on Sam's Club, and "as far as Mighty Good knew, or should have known," Surber's commitment was not binding on Sam's Club "because that's what the Supplier Agreements that Mighty Good signed say." Arkansas courts have long said that "one is bound under the law to know the contents of the papers he signs, and he cannot excuse himself by saying that the did not know what the papers contained." *Jordan v. Diamond Equip. & Supply Co.*, 362 Ark. 142, 154, 207 S.W.3d 525, 534 (2005).

Regardless of whether Surber's email commitment is, or is not, binding on Sam's Club, the circuit court properly found that Mighty Good and Rendo failed, at the outset, to point to facts showing that any of the representations by Retail Firm were knowingly false or that the alleged omissions are material. Rather, as the circuit court found, Mighty Good and Rendo's allegations are factually consistent with that which is plainly stated in the written Supplier Agreements between Mighty Good and Sam's Club that Rendo signed both before and after Surber's email commitment to order a certain quantity of 32-ounce hand sanitizer a year before the parties entered into the Termination Agreement and Guaranty. Simply put, Mighty Good and Rendo, at a minimum, failed to produce specific facts of any knowingly false representation of a material fact to support a claim of fraud. *See Morris*, 77 Ark. App. at 17, 69 S.W.3d at 880. When a party cannot present proof of an essential element of a claim, the party moving for summary judgment is entitled to judgment as a matter of law. *Wilson*, 2021 Ark. App. 46, at 3, 618 S.W.3d at 147.

24

For these reasons, we cannot say that the circuit court erred in rejecting Mighty Good and Rendo's fraudulent-inducement claims. Accordingly, we affirm the circuit court's grant of summary judgment.

Affirmed.

KLAPPENBACH, C.J., and WOOD, J., agree.

*Rose Law Firm, a Professional Association*, by: *Mary-Tipton Thalheimer*; and *Graves Garrett*, by: *Edward D. Greim*, *pro hac vice*; and *Cody S. Hagan*, *pro hac vice*, for appellants.

*Friday, Eldredge & Clark, LLP*, by: *Martin A. Kasten*, *Marshall S. Ney*, and *Kael K. Bowling*, for appellee.